**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 1:21-CR-00177 |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| REGINALD HOPKINS | : | Judge Jennifer P. Wilson |

## MEMORANDUM

Before the court is a motion to dismiss the indictment filed by Defendant

Reginald Hopkins ("Hopkins").  (Doc. 66.)  Hopkins alleges that the indictment

should be dismissed pursuant to the Speedy Trial Act and the Sixth Amendment.

(*Id.*)  For the following reasons, the court will deny the motion to dismiss the

indictment.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

In early 2021, the regional office of the Bureau of Alcohol, Tobacco,

Firearms, and Explosives ("ATF") learned that Hopkins was potentially selling

narcotics in Harrisburg and that he may be in possession of firearms.  (Doc. 68, p.

1.) [2]  Based on this information, ATF Task Force Officer Darrin Bates ("TFO

Bates"), a police office for the City of Harrisburg who is cross-designated as a

federal agent in order to work with the ATF, opened a federal investigation into

---

[1] The detailed factual recitation that is necessary for the discussion of each specific issue is
included in the Discussion section of this memorandum.

[2] For ease of reference, the court utilizes the page numbers from the CM/ECF header.

1

Hopkins' alleged gun and drug activities. (*Id.* at 1–2.) The ATF agents then utilized a confidential information ("CI") to attempt to purchase narcotics from Hopkins. (*Id.* at 2.)

On January 15, 2021, agents, with the assistance of the CI, conducted a controlled purchase of crack cocaine from an individual the CI knew as "Dreads," whom the CI later identified as Hopkins. (Doc. 67-2, p. 4.) The ATF made two subsequent unsuccessful attempts to purchase crack cocaine from Hopkins. (Doc. 68, p. 2.) Based on the information then-known to the ATF, TFO Bates applied for a search warrant for 100 Evergreen Street Apt B1 in Harrisburg[3], on February 11, 2021. (*Id.*; Doc. 67, p. 2.) The search warrant was granted by a federal Magistrate Judge on the same date. (*See* Doc. 67-3.)

ATF agents, other officers from Harrisburg Police Department, and TFO Bates executed the search warrant on February 19, 2021. (Doc. 67, p. 2.) Hopkins was present during the execution of the search warrant. (*Id.*) After officers recovered several firearms from the residence, two of which had previously been reported stolen, TFO Bates filed a state criminal complaint charging Hopkins with one count of person not to possess a firearm and two counts of receiving stolen property. (Doc. 67, pp. 2–3; Doc. 68, p. 2.)

---

[3] TFO Bates confirmed with SKYNET Property Management that Hopkins' name was on the lease for the basement apartment at this address. (Doc. 67-2, pp. 3–4.) It is also the address where the controlled purchase occurred. (*Id.* at 4–5.)

Hopkins was arraigned on the state charges filed by TFO Bates on February 19, 2021 before state Magisterial District Judge Hanif Johnson, and he was detained in lieu of $250,000 bail.  (Doc. 67, p. 3.)  The case was assigned to Magisterial District Judge David O'Leary ("MDJ O'Leary").  (*Id.* at 3, n.1.) Hopkins was unable to post bail.  (*Id.* at 3.)  Hopkins' preliminary hearing on these charges was continued several times.  (*Id.* at 3–4.)

The United States Attorneys' Office ("USAO") received the investigative materials following the execution of the search warrant.  (Doc. 68, p. 3.)  Whether the USAO would file federal charges remained an open question at the time of Hopkins' arrest on the state charges.  (*Id.* at 3, n.1.)  Ultimately, on June 23, 2021, the grand jury returned an indictment charging Hopkins with distribution of a controlled substance, namely cocaine base, in violation of 21 U.S.C. § 841(a)(1), and being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1).  (Doc. 1.)

Based on the indictment, a detainer was sent to Dauphin County Prison, where Hopkins was being detained on the state charges.  (Doc. 67, p. 4.)  On July 8, 2021, Hopkins had his initial appearance on the federal charges before Magistrate Judge Martin Carlson, and he was ordered detained.  (*Id.*)  Hopkins' state charges were later dismissed.  (Doc. 68, p. 4.)

To date, in the instant federal case, eleven motions to continue have been filed.  (*See* Docs. 19, 21, 26, 35, 40, 42, 55, 57, 59, 64, 80.)  All motions were unopposed.  (*Id.*)  Of these eleven motions, two were filed by the Government.  (*See* Docs. 55, 57.)  Additionally, Hopkins' counsel has changed numerous times.[4]  A date-certain trial has been scheduled for May 22, 2023.  (Doc. 89.)

On October 6, 2022, Hopkins filed the instant motion to dismiss the indictment pursuant to the Speedy Trial Act and the Sixth Amendment.  (Doc. 66.)[5]  A brief in support was filed the same day.  (Doc. 67.)  The Government filed its brief in opposition on October 20, 2022.  (Doc. 68.)  Hopkins timely filed a reply brief on October 25, 2022.  (Doc. 71.)  The Government filed a concession of factual issues for clarification of issues that arose during the briefing.  (Doc. 75.)  An evidentiary hearing was held on February 3, 2023.  Subsequently, the Government filed a clarification.  (Doc. 86).  Thus, the motion is ripe for review.

---

[4] The court notes that Hopkins was represented by Attorney Melissa Porter from July 8, 2021 to February 2, 2022.  (Docs. 11, 38.)  Hopkins was represented by Attorney Robert Daniels from February 2, 2022 to May 16, 2022.  (Docs. 38, 51.)  Hopkins was represented by Attorney Elisabeth Pasqualini from May 16, 2022 to November 15, 2022.  (Docs 51, 77.)  Hopkins is currently represented by Attorney John Abom, as of November 21, 2022.  (Doc. 79.)

[5] Hopkins also filed a motion to suppress evidence on February 1, 2023, and a supplemental motion to suppress evidence on February 9, 2023.  (Docs. 84, 90.)  Neither motion is ripe as of the date this opinion is being filed.  The court will address those motions by separate order at a later date.

## DISCUSSION

Hopkins moves to dismiss the Indictment based on alleged violations of his rights under the Speedy Trial Act, 18 U.S.C. § 3161(b) and (c)(1), and his Sixth Amendment right to a speedy trial.  Hopkins' first Speedy Trial Act argument relies on application of what is known as the "ruse exception," which some circuits have recognized where state charges are filed in an effort to avoid the time constraints set forth in the Speedy Trial Act.  (Doc. 67, pp. 5–10.)  Hopkins' second argument under the Speedy Trial Act relates to whether the time was properly excluded for three of the continuances granted by the court.  (*Id.* at 10–12.)  Hopkins' Sixth Amendment argument relies on the four-part balancing test set forth in *Barker v. Wingo*, 407 U.S. 514 (1972).  (Id. at 15–18.)  In all events, Hopkins argues that the dismissal of the indictment should be with prejudice.

The court will address each of these arguments in turn.

### A. Speedy Trial Act – 18 U.S.C. § 3161(b)

The parties agree that the crux of this issue is when the clock began to run for purposes of the Speedy Trial Act.  In relevant part, the Speedy Trial Act provides that "[a]ny information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges."  18 U.S.C. § 3161(b).  Here, the indictment was returned on June 23,

2021, and Hopkins had his first appearance in federal court on these charges on July 8, 2021.  However, Hopkins was arrested on the state charges on February 19, 2021.  Therefore, Hopkins' first Speedy Trial Act argument can only succeed if the court decides that the so-called "ruse exception" should apply in this case.

The Third Circuit Court of Appeals, when examining the "ruse exception," has explained:

> Under the Speedy Trial Act, "[a]ny information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges."  18 U.S.C. § 3161(b).  If the government fails to file the information or indictment within thirty days, "such charge against that individual contained in such complaint shall be dismissed or otherwise dropped."  *Id.* at § 3162(a)(1); *see also United States v. Battis*, 589 F.3d 673, 678 (3d Cir. 2009) ("In general, delay is measured from the date of arrest or indictment, whichever is earlier, until the start of trial.")  Where, as here, the defendant is arrested on state charges and later indicted on federal charges, "the right to a speedy trial in the federal case is triggered by the federal indictment, and the time period under consideration commences on that date." *Id.* at 679.  As stated in *United States v. Garner*, 32 F.3d 1305, 1309 (8th Cir. 1994), an "arrest on state charges does not engage the speedy trial protection for a subsequent federal charge."  *See also United States v. Muniz*, 1. F.3d 1018, 1024 (10th Cir. 1993) ("When [the defendant] was arrested by state authorities . . . [,] his speedy trial rights for the subsequent federal charges did not attach.")  This is true even if the federal charge shares the same facts as the state case.  *See United States v. Mills*, 964 F.2d 1186, 1189–90 (D.C. Cir. 1992).
>
> A state arrest, however, may trigger the Speedy Trial Act "when the Government has knowledge that an individual is held by state authorities solely to answer to federal charges." *United States v. Woolfolk*, 399 F.3d 590, 596 (4th Cir. 2005).  This is known as the "ruse" exception. *See United States v. Benitez*, 34 F.3d 1489, 1494 (9th

> Cir. 1994).  Under this exception, state proceedings may trigger the
> Speedy Trial Act upon a showing of "collusion or evidence that the
> detention was for the sole or primary purpose of preparing for [federal]
> criminal prosecution." *United States v. Garcia-Martinez*, 254 F.3d 16,
> 20 (1st Cir. 2001).

*United States v. Costello*, 720 Fed. App'x 120, 122–23 (3d Cir. 2018).  The Third

Circuit has also noted that "[f]ederal officials' awareness, and even involvement in,

the state court proceedings, would not establish the requisite collusion." *See*

*United States v. Dyer*, 325 F.3d 464, 470 (3d Cir. 2003).  Additionally, even if

there are federal officials involved in the state arrest who intend to bring federal

charges, that is not, on its own, sufficient to trigger the "ruse exception." *Id.* at

470.

　　Although the Third Circuit has not yet decided whether the "ruse exception"

is adopted in this Circuit, it has considered and discussed it repeatedly rather than

rejecting its application, leading the court to believe that if the right circumstances

arose, the Third Circuit may be willing to adopt it.  *See Costello*, 720 Fed. App'x

at 123 ("We have yet to adopt the 'ruse' exception"); *see also United States v.*

*Brown*, 445 Fed. App'x 474, 479 (3d Cir. 2011) ("Our Circuit has yet to recognize

a 'ruse exception' to the Speedy Trial Act's federal arrest requirement"); *Dyer*, 325

F.3d at 468 ("Even if we were to conclude that the [ruse] exception is a valid one,

[the defendant] has not shown that he would be entitled to invoke it under the

circumstances of this case").  Therefore, the court will assume, without deciding,

that the "ruse exception" could apply for purposes of resolving the instant motion. Thus, if Hopkins meets his burden of demonstrating that the state charges were filed for the sole or primary purpose of preparing the federal criminal prosecution, or that there was collusion between state and federal authorities, then the relevant date for purposes of 18 U.S.C. § 3161(b) would be the date of his state arrest— February 19, 2021—which was more than 30 days prior to the date of the Indictment.

Hopkins argues that he was the subject of a federal investigation conducted by TFO Bates, whose investigative reports were submitted on Department of Justice forms. (Doc. 67, p. 7.) Additionally, TFO Bates was working with or being supervised by Assistant United States Attorney Johnny Baer ("AUSA Baer") from the earliest days of the investigation. (*Id.*) Hopkins contends that the collusion between federal and state authorities centers around the actions of TFO Bates, because he was functioning as both a federal and state authority. (*Id.*) TFO Bates led the federal investigation, obtained and executed the federal search warrant, was working with or under the direction of the federal government, filed state criminal charges at the direction of AUSA Baer, and did not request the presence of an ADA at the preliminary hearing. (*Id.* at 8; Doc. 102, p. 47.) Hopkins also asserts that his state case was not actively pursued. (Doc. 67, p. 9.) Rather, it lingered for over five months before the charges were withdrawn. (*Id.*)

8

Hopkins argues that the state government was not prepared to prosecute the state

case.[6]  (*Id.*)

The Government argues that although the federal government was

significantly and almost exclusively involved in the investigation of this matter, the

inquiry does not end there.  (Doc. 68, p. 8.)  The Government notes that law

enforcement initially believed that Hopkins was selling illegal narcotics such as

crack cocaine, synthetic marijuana, and marijuana from his residence in

Harrisburg, and that he was "in possession of firearms on two different occasions."

(*Id.*)  However, when controlled buys were attempted, law enforcement was only

able to successfully purchase $100 worth of crack cocaine on one occasion, while

the other two attempts to purchase crack cocaine were unsuccessful.  (*Id.* at 8–9.)

Furthermore, when the search warrant was executed at Hopkins' apartment, law

enforcement did not recover any illegal narcotics during the search.  (*Id.* at 9.)

These circumstances made it less likely that Hopkins would be federally

prosecuted, as the investigation did not meet initial expectations that the search

would result in evidence demonstrating that Hopkins was a mid-level drug

trafficker.  (*Id.*)  The Government then asserts that TFO Bates filed the state

---

[6] Hopkins also asserts that there is no evidence to show that the District Attorney's Office was
even aware of the charges against Hopkins until the date they were dismissed.  (Doc. 67, p. 9.)
However, ADA Erin Varley testified that there was an ADA present and prepared to handle
preliminary hearings, but Hopkins' case was one of many that were continued due to workload
and COVID protocols.  (Doc. 102, pp. 13, 16, 28, 30–31.)

criminal complaint, TFO Bates was prepared to attend the preliminary hearing

when it was scheduled, and that there was nothing unique about the state charges

TFO Bates filed.  (*Id.*)  The Government contends that Hopkins has failed to

establish that any collusion took place, let alone collusion with the primary purpose

of circumventing the Speedy Trial Act.  (*Id.* at 11.)

In reviewing case law, the court notes at the outset that the courts that have

address the "ruse exception" have applied an exacting standard.  Moreover, the

court faces significant difficulty in applying the test because the Third Circuit has

not officially adopted or fleshed out the contours of the exception, and because the

genesis of the ruse exception was in the context of civil detention for illegal

immigrants.  As a result, it is unclear whether the burden is on the Government to

make a showing that the state intended to follow through in prosecuting the state

charges, or whether the burden remains on Hopkins alone as the movant.[7]

The facts at issue in this case make the argument in favor of applying the

"ruse exception" colorable.  This is not a circumstance in which a purely state or

local investigation was later adopted by federal law enforcement officials for

federal prosecution.  Rather, the investigation began as a federal one.  Authorities

obtained a federal wiretap, utilized a CI who was working with federal agents, then

---

[7] The court located a Fifth Circuit Court of Appeals decision stating that "the defendant bears the
burden of proof when claiming that the ruse exception applies to his case," without further
explanation.  *See United States v. Mooneyham*, 376 Fed. App'x 440, 441 (5th Cir. 2010).

applied for, obtained, and executed a federal search warrant. It appears that the only nexus to the state was that TFO Bates is also a police officer for the City of Harrisburg. Additionally, there was testimony at the hearing that after execution of the search warrant, TFO Bates spoke with AUSA Baer over the phone to relay what was recovered. During that conversation, AUSA Baer asked TFO Bates whether there was enough to file state charges and then advised TFO Bates to do so. (Doc. 102, pp. 47, 50.)

Additionally, Hopkins' preliminary hearing was continued and re-scheduled four times, resulting in Hopkins' incarceration at Dauphin County Prison on state charges for over four months without having a preliminary hearing. (Doc. 67, pp. 3–4.) While there was testimony at the hearing that the delay was also due to COVID-caused backlogs, it remains true that there was a significant time period in which Hopkins' case languished at the state court level, with little to no action being taken.

However, given the exacting standard to be applied, and even assuming that the Government bears the burden, the court finds that there is sufficient evidence upon which the court can conclude that state authorities intended to prosecute Hopkins at the state level. ADA Varley testified that the Dauphin County District Attorney's Office sends attorneys out to every single preliminary hearing, and that Hopkins' preliminary hearing dates were no exception. (Doc. 102, p. 28.) She

also testified that she spoke with Hopkins' counsel on June 28, 2021, one of the scheduled preliminary hearing dates, and discussed the possibility of either proceeding with a preliminary hearing that date, or requesting a continuance with the understanding that the federal detainer would soon be lodged, at which point the state charges would be withdrawn.  (Doc. 102, pp. 34–35.)  This testimony demonstrates that the state authorities were willing to pursue the state charges *despite* the pending federal indictment.  Finally, she testified that Hopkins' case was handled normally, and that she and her office did not know Hopkins would be indicted until she received an email from AUSA Miovas on June 25, 2021.  (Doc. 102, p. 25; Govt. Ex. 1, pp. 2–3.)  TFO Bates testified that he was at the preliminary hearings if they were not continued before he arrived.  (Doc. 102, p. 59.)  Crucially, when asked about his intent when filing the state criminal complaint against Hopkins, TFO Bates testified that: "if we did not have enough to charge him federally, that we would go through with the state process."  (Doc. 102, p. 48.)  In light of this evidence, the court cannot conclude that Hopkins was held in state custody for the sole or primary purpose of preparing a federal criminal prosecution.[8]

---

[8] The exacting standard for demonstrating that the state charges were merely a ruse for federal prosecution begs the question: what would a defendant need to show in order to satisfy this standard?  If a criminal defendant is required to demonstrate, through Government witnesses, that there was never an intention to follow through on prosecuting the state charges, the evidentiary difficulty facing defendants in this situation is exceptionally high.  Fairness may dictate that the government bear the burden of persuasion on this issue.

Additionally, Hopkins has not made a sufficient showing that the requisite level of collusion was present.  Nothing in ADA Varley's testimony demonstrates anything more than coordination between federal and state authorities.  Moreover, to the extent that Hopkins asserts that TFO Bates' dual role as a federal and state law enforcement officer satisfies the collusion requirement, this argument is unavailing.  Federal officials' awareness or involvement in state court proceedings does not establish collusion.  *See Dyer*, 325 F.3d at 470.  Federal officials' involvement in the state arrest even when they intend to bring federal charges is also insufficient to establish collusion without more.  *Id.*

Therefore, while the court regards the circumstances present as a close call, the court ultimately concludes that Hopkins has not satisfied his burden of demonstrating that the state charges were "for the sole or primary purpose of preparing for [federal] criminal prosecution," nor has he demonstrated the requisite collusion between federal and state authorities for the "ruse exception" to apply. *See Costello*, 720 Fed. App'x at 123 (citing *United States v. Garcia-Martinez*, 254 F.3d 16, 20 (1st Cir. 2001)).  Thus, 18 U.S.C. § 3161(b) was not violated, as there was not more than 30 days between Hopkins' initial federal appearance and the indictment.  Accordingly, the court will deny this portion of Hopkins' motion.

**B. Speedy Trial Act – 18 U.S.C. § 3161(c)(1)**

Alternatively, Hopkins argues that even absent application of the "ruse exception," there was a violation of Section 3161(c)(1) of the Speedy Trial Act because he was not brought to trial within 70 non-excludable days from the date of his first appearance before a judicial officer of this court.  (Doc. 67, pp. 10–11.) Hopkins argues that three of the continuances granted by the court did not include the court's reasoning for granting such continuances, and the time is therefore not excludable for Speedy Trial purposes.  (*Id.* at 11.)  The Government offered no specific arguments on this point.  (Doc. 68.)

The Speedy Trial Act provides, in relevant part, that:

> In any case in which a plea of guilty is entered, the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs.

18 U.S.C. § 3161(c)(1).  The failure of the Government to do so must result in the dismissal of the information or indictment upon motion of the defendant.  18 U.S.C. § 3126(a)(2).  The seventy-day limit, however, is not absolute.  Section 3161(h) of the Speedy Trial Act sets forth several categories of delay that must be excluded from the calculation of the seven-day time frame, set forth in pertinent part here:

> Any period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial.  No such period of delay resulting from a continuance granted by the court in accordance with this paragraph shall be excludable under this subsection unless the court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial.

18 U.S.C. § 3161(h)(7)(A).

The three orders granting defense motions for continuances in this case that Hopkins alleges are insufficient are at Docs. 20, 22, and 27.  All three of the orders contain the following identical language:

> AND NOW this [date], before the Court is a Motion filed by the Defendant, Reginald Hopkins, requesting that the pretrial motions deadline and jury selection and trial be continued.  Therefore, the Court concludes that the circumstances present indicate that a continuance of the trial date is warranted and that an extension of the trial date outweighs the interests of the public and defendant in a speedy trial.

(Doc. 20, p. 1; Doc. 22, p. 1; Doc. 27, p. 1.)  Additionally, all three of the orders likewise contain the following identical language: "The Court specifically finds under 18 U.S.C. § 3161(h)(7)(A) that the ends of justice served by granting this extension and continuance outweigh the interests of the public and the defendant to a speedy trial."  (Doc. 20, p. 2; Doc. 22, p. 2; Doc. 27, p. 2.)

Where a district court's order contains such language, the court need not provide factual justifications for the continuance at the time it is entered but can instead "supplement the record with further details" on why a continuance serves the "ends of justice" at a later date. *United States v. Reese*, 917 F.3d 177, 182 (3d Cir. 2019). However, the Third Circuit also held that "[a]lthough the district court may not merely incorporate by reference the reasons set out in the statute, it is not necessary for it to articulate facts which are obvious and are set forth in the motion for the continuance itself." *United States v. Lattany*, 982 F.2d 866, 879 (3d Cir. 1992). Here, the court referenced the "circumstances present" in each order, which is a reference to the motions for continuance. Thus, the court turns to the corresponding motions leading to the court issuing the three contested orders.

In the first relevant motion to continue filed by Hopkins' counsel, counsel asserts that discovery had not yet been received. (Doc. 19, p. 2.) In the second relevant defense motion to continue, Hopkins' counsel asserts that additional time is necessary to review the discovery with Hopkins and to explore the possibility of any plea negotiations. (Doc. 21, p. 2.) Finally, in the third relevant defense motion to continue, Hopkins' counsel asserts that additional time is necessary to discuss outstanding matters with Hopkins. (Doc. 26, p. 2.) Additionally, counsel notes that trial in Hopkins' matter was listed for December 6, 2021, but that counsel was scheduled to begin a trial before the court in another matter on that date. (*Id.* at 2–

3.)  Therefore, the court concludes that it is clear, from the face of the motions to

continue, the factual basis for the court's finding that the ends of justice served by

granting the extensions and continuances outweighed the interests of the public and

the defendant to a speedy trial.  Thus, the time was properly excluded and there has

been no violation of 18 U.S.C. § 3161(c)(1).

### C. Sixth Amendment

Defendant's last argument is that the indictment should be dismissed

because the unwarranted delay in bringing him to trial violated his Sixth

Amendment right to a Speedy Trial.  (Doc. 67, p. 15.)[9]  The Sixth Amendment

states, in pertinent part, that "in all criminal prosecutions, the accused shall enjoy

the right to a speedy . . . trial[.]"  U.S. CONST. AMEND. VI.  "The United States

Supreme Court has adopted a flexible balancing test to adjudicate alleged

violations of the Sixth Amendment Speedy Trial Clause."  *Hakeem v. Beyer*, 990

F.2d 750, 759 (3d Cir. 1993) (citing *Barker v. Wingo*, 407 U.S. 514, 533).  The

factors for the court to consider are: "length of delay, the reason for the delay, the

defendant's assertion of his right, and prejudice to the defendant."  *Barker*, 407

---

[9] The court considers Defendant's Sixth Amendment argument despite the observation that "it will be an unusual case in which the time limits of the Speedy Trial Act have been met but the sixth amendment right to a speedy trial has been violated."  *United States v. Green*, 471 F. Supp. 3d 577, 594 (M.D. Pa. 2020) (quoting *United States v. Alvin*, 30 F. Supp. 3d 323, 340 (E.D. Pa. 2014)).

U.S. at 530.  All factors must be considered and weighed as no one factor is dispositive or "talismanic."  *Id.* at 533.

### 1. Length of Delay

The Supreme Court has explained that the first factor, the length of delay, actually involves two inquiries:

> Simply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from "presumptively prejudicial" delay, since, by definition, he cannot complain that the government has denied him a "speedy" trial if it has, in fact, prosecuted his case with customary promptness.  If the accused makes this showing, the court must then consider, as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim.  This latter enquiry is significant to the speedy trial analysis because . . . the presumption that pretrial delay has prejudiced the accused intensifies over time.

*Doggett v. United States*, 505 U.S. 647, 651 (1992) (internal citations omitted).

"Presumptive prejudice," as defined by the Supreme Court in this threshold context, simply "marks the point at which courts deem the delay unreasonable enough to trigger the *Barker* enquiry."  *Id.* at 652 n.1.  The Supreme Court has found that a delay of 8.5 years is sufficient to trigger this review.  *Id.* at 652.  Indeed, the Third Circuit has held that delays of as little as "fourteen months is sufficient to trigger review of the remaining *Barker* factors."  *United States v. Claxton*, 766 F.3d 280, 294 (3d Cir. 2014) (quoting *United States v. Battis*, 589 F.3d 673, 678 (3d Cir. 2009)).

In this case, the time between the Indictment and the date of the filing of the motion was almost sixteen months—beyond the threshold set by the Third Circuit to trigger the *Barker* inquiry.  Indeed, the Government does not contest the court's consideration of the remaining *Barker* factors.  (Doc. 68, p. 15) ("Based on the period of delay and nature of the case in this matter, the government does not contest the application of the remaining factors . . . .")

### 2.  Reason for Delay

Next, the court will consider the second *Barker* factor: the reason for the delay.  As the Court of Appeals for the Third Circuit has explained:

> The government bears the burden of justifying the delay in bringing a defendant to trial.  *Battis*, 589 F.3d at 680 (citing *Hakeem*, 990 F.2d at 770).  "In evaluating this factor, we subtract the amount of delay caused by the defendant from the delay caused by the Government."  *Id.* (citing *United States v. Dent*, 149 F.3d 180, 184–85 (3d Cir. 1998)).  In *Battis*, we set forth the three categories of delay and the resulting weight each carries against the government: (1) "A deliberate effort by the Government to delay the trial in order to hamper the defense weighs heavily against the government;" (2) "A more neutral reason such as negligence or overcrowded courts also weighs against the Government, though less heavily;" and (3) "a valid reason, such as a missing witness, should serve to justify appropriate delay."  *Id.* at 679 (internal quotation marks and citations omitted).  "By contrast, delay caused by the defense weighs against the defendant."  *Id.* at 680 (internal quotation marks omitted).

*Claxton*, 766 F.3d at 294–95.

Hopkins asserts that the reason for the delay "lies squarely with the government as detailed above," presumably referring to the arguments made

19

regarding the "ruse exception." (Doc. 67, p. 16.) Hopkins provides no specific arguments relating to why the reason for delay lies squarely with the Government after the date of Indictment or initial federal appearance. Conversely, the Government asserts that the reason for delay "rests almost exclusively with the defendant." (Doc. 68, p. 17.) On this score, the Government argues that the majority of the motions to continue the trial date in this matter have been filed by Hopkins and that his contentious interactions with his own attorneys resulted in their withdrawal from the case.[10] (*Id.*) Each change in counsel resulted in additional continuance requests because replacement counsel was not prepared to proceed to trial without getting up to speed. (*Id.*) Indeed, as discussed in more detail below, Hopkins was informed of the same by the court on more than one occasion and the two Government continuance requests were filed on the heels of Hopkins' third attorney being appointed. Thus, the Government asserts that the delay is exclusively attributable to Hopkins and this factor weighs heavily in favor of the Government and is a sufficient basis to deny the motion. (*Id.* at 17–18.)

Upon review of the docket in this case, the court agrees that the reason for delay lies almost exclusively with Hopkins even though he may have been opposed

---

[10] The court notes that at the time of the filing of the briefs, eight of the ten motions to continue were filed by Hopkins. At the time of the writing of this opinion, an additional defense request for a continuance was filed and granted. Additionally, at the time of the filing of the briefs, two of Hopkins' attorneys had requested, and been granted, permission to withdraw. At the time of the writing of this opinion, a third attorney requested, and was granted, permission to withdraw.

to his counsel requesting continuances in some instances.  Addressing a similar situation, the Ninth Circuit found that this factor did not weigh in favor of the defendant where his attorney requested almost half of the continuances: "the Supreme Court has held that an attorney may waive his client's speedy trial right without express permission because scheduling matters are plainly among those for which agreement by counsel generally controls, and requiring express assent from the defendant himself for such routine and often repetitive scheduling determinations would consume time to no apparent purpose."  *Cejas v. Blanas*, 366 Fed. App'x 763, 765 (9th Cir. 2010) (citing *New York v. Hill*, 528 U.S. 110, 114–15 (2000)).  Thus, where almost all of the motions to continue here have been filed by Hopkins' counsel and his interactions with his attorneys resulted in the appointment of replacement counsel numerous times, the court concludes that this factor weighs heavily in favor of the Government.  However, the court declines the Government's invitation to end the inquiry there.

### 3.  Defendant's Assertion of His Right

The court thus turns to the third factor for consideration: Defendant's assertion of his right, "including 'the frequency and force' of such assertions." *United States v. Velazquez*, 749 F.3d 161, 183 (3d Cir. 2014) (quoting *Barker*, 407 U.S. at 529).  The court finds that Hopkins did assert his right to a speedy trial. However, the court ultimately views this factor as neutral based on Hopkins'

conduct, which caused additional, significant delays.  While it is true that Hopkins repeatedly sent letters to the court explicitly complaining that his attorneys were requesting continuances without his consent, the continuance requests were well-documented and largely based on concerns outside of his counsel's control, such as not yet having received discovery, needing time to review discovery with Hopkins, pending motions, and the court calendar.  (*See* Docs 19, 21, 26, & 35.)  Despite this, Hopkins began filing complaints with the court about counsel and accusing counsel of colluding with the Government.  (Docs. 25, 33.)  As a result, status conferences were scheduled to address issues relating to representation and his first attorney was permitted to withdraw because Hopkins filed a civil suit naming her as a defendant.  (*See* Doc. 36.)

When Hopkins' second attorney was appointed, two motions to continue were filed because the attorney needed time to review the discovery materials, there was a pending motion, and he was discussing additional pre-trial issues Hopkins wanted to raise that had not yet been addressed.  (Docs. 40, 42.)  Soon thereafter, Hopkins submitted a letter objecting to the motions to continue being filed by his attorney.  (Doc. 44.)  Two weeks later, Hopkins submitted another letter to the court accusing his attorney of misconduct and colluding with the Government.  (Doc. 46.)  Following a status conference, his attorney was again permitted to withdraw, and new counsel was appointed.  (*See* Doc. 51.)

The court specifically advised Hopkins at the status conference that appointing new counsel would result in additional delay, which Hopkins stated that he understood.  However, following the Government's two motions to continue trial and pre-trial deadlines, Hopkins' new attorney filed a motion to continue because of her recent appointment and needing additional time to review the case materials to determine whether she would be filing any motions on Hopkins' behalf.  (*See* Doc. 59.)  Less than a month later, Hopkins again filed a letter alleging ineffective assistance of counsel.  (Doc. 61.)  Following an in-person status conference, Hopkins' concerns about counsel were alleviated.  Hopkins' attorney then filed another motion to continue, asserting that she was filing a pretrial motion on his behalf and additional time was needed for the motion to be fully briefed and decided.  (Doc. 64.)  A week later, the instant speedy trial motion was filed.  (Doc. 66.)  However, Hopkins again submitted a letter alleging ineffective assistance of counsel.  (Doc. 69.)  Following an in-person status conference on the date that was intended to be an evidentiary hearing on the instant motion, the court granted Hopkins' counsel's oral motion to withdraw and appointed new counsel.  (Docs. 77–79.)  At the status conference, Hopkins was again advised that the appointment of new counsel would result in additional motions to continue being filed on his behalf so new counsel could get up to speed on his case, which Hopkins stated he understood.

23

Hopkins cannot have it both ways—he cannot assert his right to a speedy trial verbally and in writing to the court, but repeatedly impede the progress of his case and delay proceedings through his own conduct.  Therefore, this factor is neutral.

### 4.  Prejudice

Finally, the court considers the issue of prejudice to Hopkins.  The Supreme Court has identified "three types of harm that arise from unreasonable delay between formal accusation and trial: (1) 'oppressive pretrial incarceration;' (2) 'anxiety and concern of the accused;' and (3) 'the possibility that the [accused's] defense will be impaired by dimming memories and loss of exculpatory evidence."  *Claxton*, 766 F.3d at 296 (quoting *Doggett*, 505 U.S. at 654).  While excessive delay can lead to a presumption of prejudice, "such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria . . . it is part of the mix of relevant facts, and its importance increases with the length of delay."  *Doggett*, 505 U.S. at 655−56.

Here, Hopkins argues that he has suffered significant prejudice from the delay in bringing his case to trial.  (Doc. 67, pp. 17–18.)  Hopkins contends that he suffered prejudice as a result of the Government's delay due to oppressive pretrial detention at Dauphin County Prison, where inmates are regularly under 24-hour lockdown, workers sleep on the job, and inmates are dying.  (*Id.* at 17.)

Additionally, Hopkins notes that a serious staffing shortage has contributed to his inadequate access to the law library.  (*Id.*)

Furthermore, Hopkins pointed to the fact that he was only charged with firearm offenses at the state level, whereas a felony drug charge was added when he was indicted federally.  (*Id.*)  Thus, Hopkins asserts that if the Government had promptly indicted him, Hopkins would have been able to secure impeachment witnesses and obtain his cell phone records.  (*Id.* at 17–18.)  Moreover, because of prison restrictions, Hopkins asserts that there has been some difficulty in reviewing the audio recording in this case.  (*Id.* at 18.)  Finally, Hopkins contends that he has suffered a loss of employment, disruption of his family life, requires medication to treat anxiety and depression which came about during his incarceration, and lost his material belongings and personal mementos.  (*Id.*)  Therefore, Hopkins argues that dismissal of the indictment against him with prejudice is the appropriate remedy.

The Government notes that impairment of the defense is the most serious consideration, and that Hopkins' arguments about the prejudice he has suffered are largely attributable to his own actions and should not be weighed against the Government.  (Doc. 68, pp. 19–20.)  The Government cites *United States v. Duran-Gomez*, 984 F.3d 366, 374–75 (5th Cir. 2020) in which the Fifth Circuit Court of Appeals held that where a defendant contributes to delay by asking for

continuances, he "will not be heard to complain of a lapse of time attributable to continuances he sought and received from the court." (*Id*.) Furthermore, the Government argues that Hopkins relies solely on general, speculative, or conclusory allegations about prejudice, which are insufficient to satisfy his burden to show specific prejudice to the defense of his case. (*Id*. at 21.) Finally, the Government contends that the restrictions of the correctional facility in which Hopkins is housed are likewise insufficient to demonstrate prejudice in this context and do not warrant the extreme remedy of dismissal. (*Id*.)

First, the court notes that any arguments Hopkins advances relating to the lapse in time between the state charges and the federal indictment are not proper in this context. For Sixth Amendment *Barker* analysis purposes, the relevant time frame is the time frame "between formal accusation and trial." *Claxton*, 776 F.3d at 296. Hopkins has not made an argument that the "ruse exception" should apply to the Sixth Amendment, nor has the court located any case law standing for this proposition. In any event, as explained above, the court has not applied the exception to the facts of this case. Thus, the focus of the prejudice analysis begins from the date of his indictment.

As to impairment of Hopkins' defense, examining only those arguments that relate to the delay from the time of his indictment forward, the court notes that Hopkins testified at the hearing that the cell phone company only retained records

for six months.  (Doc. 102, p. 76.)  Assuming he would have sought to obtain cell phone records surrounding the controlled buy on January 15, 2021, the records would have been available until approximately July 15, 2021.  Therefore, the duration between the indictment and the date the records became unavailable was less than one month.  Furthermore, other records (relating to the later attempts to conduct controlled purchases) would have still been available when the indictment was returned.  The other argument Hopkins sets forth relating to the impairment of his defense is that if he had been promptly indicted, he would have been able to secure impeachment witnesses.  However, Hopkins does not point to any specifics of the impeachment witnesses and why post-indictment delay impeded his ability to obtain these witnesses.

As to oppressive pretrial conditions, Hopkins argues that the conditions at Dauphin County Prison are oppressive, and sets forth various complaints about his incarceration, such as difficulty reviewing evidence, loss of employment, disruption of family life, anxiety and depression, and lost belongings and mementos.  The court concludes that Hopkins has not satisfied his burden as he has neither shown that the time period is presumptively prejudicial, nor has he offered "proof of sub-standard conditions or other oppressive factors beyond those that necessarily attend imprisonment."  *Hakeem v. Beyer*, 990 F.2d 750, 761 (3d Cir. 1993); *see also United States v. Claxton*, 766 F.3d 280, 297 (3d Cir. 2014)

("[Defendant] has given no indication that he faced substandard conditions as compared to those generally associated with the transfer of prisoners").  While the confinement conditions described by Hopkins are less than desirable, he has not offered proof of substandard conditions or other oppressive factors beyond those that ordinarily attend imprisonment.  The court notes that the Third Circuit has held that pretrial incarceration of thirteen or fourteen and a half months did not demonstrate per se oppressive pretrial delay.  *Hakeem*, 990 F.2d at 761.  While Hopkins' pretrial incarceration this case lasted from July 2021 through February 2023,[11] given Hopkins' own contributions to the significant delays in this case, the court concludes that the time period is not presumptively prejudicial.  Accordingly, the court finds a slight degree of prejudice to Hopkins arising from the length of delay in this case despite the fact that the delay has been caused almost exclusively by Hopkins' own conduct.  Therefore, this factors weighs only slightly in favor of Hopkins.

In balancing the *Barker* factors, the court acknowledges that the delay in this case is sufficient to trigger the *Barker* analysis.  The reason for delay factor weighs heavily in favor of the Government, as almost all of the delay in this case was attributable to Hopkins' own conduct.  Though the court acknowledges that Hopkins asserted his speedy trial right, his assertion of his right was tempered by

---

[11] The court notes that Hopkins was released on conditions on February 16, 2023.  (*See* Doc. 95.)

his own actions, and this factor is therefore neutral.  Furthermore, the prejudice factor weighs slightly in favor of Hopkins, but is again tempered by his own conduct.  In light of these considerations, the court concludes that the balance tilts in favor of the Government, and Hopkins has not demonstrated a Sixth Amendment speedy trial violation.  Therefore, the court will deny Defendant's motion to dismiss the Indictment.

## CONCLUSION

For the foregoing reasons, Hopkins' motion to dismiss the indictment will be denied.  An appropriate order follows.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: March 6, 2023