## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 1:21-CR-00177 |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| REGINALD HOPKINS | : | Judge Jennifer P. Wilson |

## <u>MEMORANDUM</u>

Before the court is a motion to dismiss the indictment filed by Defendant Reginald Hopkins ("Hopkins"). (Doc. 66.) Hopkins alleges that the indictment should be dismissed pursuant to the Speedy Trial Act and the Sixth Amendment. (*Id.*) On March 6, 2023, the court issued a memorandum and order denying Hopkins' motion to dismiss the indictment. (Docs. 103, 104.) However, the court subsequently granted Hopkins' motion to reconsider the motion based on newly disclosed information on March 16, 2023. (Doc. 109.) For the following reasons, the court will grant in part and deny in part the motion to dismiss the indictment.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

In early 2021, the regional office of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") learned that Hopkins was potentially selling narcotics in Harrisburg and that he may be in possession of firearms. (Doc. 68, p.

---

[1] The detailed factual recitation that is necessary for the discussion of each specific issue is included in the Discussion section of this memorandum.

1.) [2]  Based on this information, ATF Task Force Officer Darrin Bates ("TFO Bates"), a police officer for the City of Harrisburg who is cross-designated as a federal agent in order to work with the ATF, opened a federal investigation into Hopkins' alleged criminal activities.  (*Id.* at 1–2.)  The ATF agents then utilized a confidential information ("CI") to attempt to purchase narcotics from Hopkins. (*Id.* at 2.)

On January 15, 2021, agents, with the assistance of the CI, conducted a controlled purchase of crack cocaine from an individual the CI knew as "Dreads," whom the CI later identified as Hopkins.  (Doc. 67-2, p. 4.)  The ATF made two subsequent unsuccessful attempts to purchase crack cocaine from Hopkins.  (Doc. 68, p. 2.)  TFO Bates applied for a search warrant for 100 Evergreen Street, Apt B1 in Harrisburg,[3] on February 11, 2021.  (*Id.*; Doc. 67, p. 2.)  The search warrant was granted by a federal Magistrate Judge on the same date.  (*See* Doc. 67-3.)

ATF agents, other officers from Harrisburg Police Department, and TFO Bates executed the search warrant on February 19, 2021.  (Doc. 67, p. 2.)  Hopkins was present during the execution of the search warrant.  (*Id.*)  After officers recovered several firearms from the residence, two of which had previously been

---

[2] For ease of reference, the court utilizes the page numbers from the CM/ECF header.

[3] TFO Bates confirmed with SKYNET Property Management that Hopkins' name was on the lease for the basement apartment at this address.  (Doc. 67-2, pp. 3–4.)  It is also the address where the controlled purchase occurred.  (*Id.* at 4–5.)

reported stolen, TFO Bates filed a state criminal complaint charging Hopkins with one count of person not to possess a firearm and two counts of receiving stolen property.  (Doc. 67, pp. 2–3; Doc. 68, p. 2.)

Hopkins was arraigned on the state charges filed by TFO Bates on February 19, 2021 before state Magisterial District Justice Hanif Johnson, and he was detained in lieu of $250,000 bail.  (Doc. 67, p. 3.)  The case was assigned to Magisterial District Justice David O'Leary ("MDJ O'Leary").  (*Id.* at 3, n.1.) Hopkins was unable to post bail.  (*Id.* at 3.)  Hopkins' preliminary hearing on these charges was continued several times.  (*Id.* at 3–4.)

The United States Attorneys' Office ("USAO") received the investigative materials following the execution of the search warrant.  (Doc. 68, p. 3.)  On June 23, 2021, the grand jury returned an indictment charging Hopkins with distribution of a controlled substance, namely cocaine base, in violation of 21 U.S.C. § 841(a)(1), and being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1).  (Doc. 1.)

Based on the indictment, a detainer was sent to Dauphin County Prison, where Hopkins was being detained on the state charges.  (Doc. 67, p. 4.)  On July 8, 2021, Hopkins had his initial appearance on the federal charges before Magistrate Judge Martin Carlson, and he was ordered detained.  (*Id.*)  The state charges against Hopkins were dismissed on July 28, 2021.  (Doc. 68, p. 4.)

On October 6, 2022, Hopkins filed the instant motion to dismiss the indictment pursuant to the Speedy Trial Act and the Sixth Amendment.[4]  (Doc. 66.)  Following a hearing on February 3, 2023, the court issued a memorandum and order on March 6, 2023 denying Hopkins' motion to dismiss the indictment. (Docs. 103, 104.)

However, on March 15, 2023, Hopkins filed a motion to reconsider the instant motion based up on newly disclosed information.  (Doc. 106.)   The newly disclosed information was a bail recommendation TFO Bates made to MDJ Johnson before Hopkins was arraigned on the state charges.  (*Id.* at 9.)  During the first hearing, the bail recommendation was not mentioned.  TFO Bates located the bail recommendation on February 23, 2023, 20 days after the first evidentiary hearing in this matter.  (*Id.*, ¶ 4.)  The document was produced to defense counsel on March 6, 2023–the same day the court filed the original memorandum and order denying Hopkins' motion.  (*Id.*, ¶ 8.)  No information was provided to the court about when TFO Bates provided the document to Government counsel.

On March 16, 2023, following a telephone status conference with counsel, the court granted Hopkins' motion for reconsideration and re-opened the record to consider additional evidence in support of Hopkins' motion to dismiss the

---

[4] Hopkins also filed a motion to suppress evidence on February 1, 2023, and a supplemental motion to suppress evidence on February 9, 2023.  (Docs. 84, 90.)  The court will address those motions by separate order.

indictment.  (Doc. 109.)  The hearing for additional evidence in support of the instant motion was held in conjunction with the previously-scheduled *Franks* hearing on March 24, 2023.  (*Id.*)  Hopkins filed an additional brief in support on March 31, 2023.  (Doc. 111.)  The Government timely filed a brief in opposition on April 10, 2023.  (Doc. 116.)  No reply brief was filed.  Therefore, the motion to dismiss is again ripe for resolution.

A date-certain trial has been scheduled for May 22, 2023.  (Doc. 89.)

### DISCUSSION

Hopkins' initial motion sought dismissal of the indictment based on alleged violations of his rights under the Speedy Trial Act, 18 U.S.C. §§ 3161(b) and (c)(1), and the Sixth Amendment.  Hopkins' first Speedy Trial Act argument relies on application of what is known as the "ruse exception," which some circuits have recognized where state charges are filed in an effort to avoid the time constraints set forth in the federal Speedy Trial Act.  (Doc. 67, pp. 5–10.)  Because Hopkins' arguments for reconsideration and new evidence relate solely to his statutory Speedy Trial Act arguments, and because the court finds this to be dispositive, the court need not address the Sixth Amendment speedy trial argument again in this opinion.

**A. Speedy Trial Act – 18 U.S.C. § 3161(b)**

The parties agree that the crux of the statutory issue in this case is when the clock began to run for purposes of the Speedy Trial Act.  In relevant part, the Speedy Trial Act provides that "[a]ny information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges."  18 U.S.C. § 3161(b).  Here, the indictment was filed on June 23, 2021, and Hopkins had his first appearance in federal court on these charges 15 days later on July 8, 2021.  However, Hopkins was arrested on related state charges on February 19, 2021.  Therefore, Hopkins' first Speedy Trial Act argument can only succeed if the court decides that the so-called "ruse exception" should apply in this case.

The Third Circuit Court of Appeals, when examining the "ruse exception," has explained:

> Under the Speedy Trial Act, "[a]ny information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges."  18 U.S.C. § 3161(b).  If the government fails to file the information or indictment within thirty days, "such charge against that individual contained in such complaint shall be dismissed or otherwise dropped."  *Id.* at § 3162(a)(1); *see also United States v. Battis*, 589 F.3d 673, 678 (3d Cir. 2009) ("In general, delay is measured from the date of arrest or indictment, whichever is earlier, until the start of trial.")  Where, as here, the defendant is arrested on state charges and later indicted on federal charges, "the right to a speedy trial in the federal case is

triggered by the federal indictment, and the time period under consideration commences on that date." *Id.* at 679.  As stated in *United States v. Garner*, 32 F.3d 1305, 1309 (8th Cir. 1994), an "arrest on state charges does not engage the speedy trial protection for a subsequent federal charge." *See also United States v. Muniz*, 1. F.3d 1018, 1024 (10th Cir. 1993) ("When [the defendant] was arrested by state authorities . . . [,] his speedy trial rights for the subsequent federal charges did not attach.")  This is true even if the federal charge shares the same facts as the state case. *See United States v. Mills*, 964 F.2d 1186, 1189–90 (D.C. Cir. 1992).

A state arrest, however, may trigger the Speedy Trial Act "when the Government has knowledge that an individual is held by state authorities solely to answer to federal charges." *United States v. Woolfolk*, 399 F.3d 590, 596 (4th Cir. 2005).  This is known as the "ruse" exception. *See United States v. Benitez*, 34 F.3d 1489, 1494 (9th Cir. 1994).  Under this exception, state proceedings may trigger the Speedy Trial Act upon a showing of "collusion or evidence that the detention was for the sole or primary purpose of preparing for [federal] criminal prosecution." *United States v. Garcia-Martinez*, 254 F.3d 16, 20 (1st Cir. 2001).

*United States v. Costello*, 720 Fed. App'x 120, 122–23 (3d Cir. 2018).  The Third Circuit has also noted that "[f]ederal officials' awareness, and even involvement in, the state court proceedings, would not establish the requisite collusion." *See United States v. Dyer*, 325 F.3d 464, 470 (3d Cir. 2003).  Additionally, even if there are federal officials involved in the state arrest who intend to bring federal charges, that is not, on its own, sufficient to trigger the "ruse exception." *Id.* at 470.

The Third Circuit has not yet decided whether to adopt the "ruse exception." However, the Court has considered and discussed it repeatedly rather than rejecting

its application, leading this court to believe that the Third Circuit is likely to adopt the "ruse exception" if the factual circumstances of a case compel such a determination. *See Costello*, 720 Fed. App'x at 123 ("We have yet to adopt the 'ruse' exception"); *see also United States v. Brown*, 445 Fed. App'x 474, 479 (3d Cir. 2011) ("Our Circuit has yet to recognize a 'ruse exception' to the Speedy Trial Act's federal arrest requirement"); *Dyer*, 325 F.3d at 468 ("Even if we were to conclude that the [ruse] exception is a valid one, [the defendant] has not shown that he would be entitled to invoke it under the circumstances of this case"). Because it is reasonably clear that the Third Circuit would adopt this exception under the right circumstances, and the court perceives that the right circumstances exist here as the record has been developed by the parties, the court will apply the "ruse exception" in this case.

As recognized by other Circuits that have adopted the "ruse exception," the exception exists because "[t]he Speedy Trial Act would lose all force if federal criminal authorities could arrange with state authorities to have the state authorities detain a defendant until federal authorities are ready to file criminal charges." *United States v. Benitez*, 34 F.3d 1489, 1494 (9th Cir. 1994). Thus, if Hopkins meets his burden of demonstrating that the state charges were filed for the sole or primary purpose of preparing the federal criminal prosecution, or that there was

collusion between state and federal authorities,[5] then the relevant date for purposes of 18 U.S.C. § 3161(b) would be the date of his state arrest—February 19, 2021—which was more than 30 days prior to the date of the indictment.

Having reviewed the case law addressing the elements of the "ruse exception," the court notes that there is some inconsistency.  It is unclear whether there are two elements that both need to be proved, whether a defendant can succeed by proving either of two elements, or whether there is only one element. *See, e.g., Costello*, 720 Fed. App'x at 123 ("state proceedings may trigger the Speedy Trial Act upon a showing of collusion or evidence that the detention was for the sole or primary purpose of preparing for [federal] criminal prosecution"); *United States v. Garcia-Martinez*, 254 F.3d 16, 20 (1st Cir. 2001) ("Garcia-Martinez does not claim that there was collusion.  Nor does he argue that he was arrested for prosecutorial purposes"); *Dyer*, 325 F.3d at 168 ("a civil detention triggers the Speedy Trial Act's time limit when federal criminal officials collude

---

[5] The Government, in its post-hearing brief in opposition, relies on case law from the Tenth and Eleventh Circuit Courts of Appeals in arguing that the court should require proof of an additional element—that the state authorities did not have a lawful basis for the state detention.  (Doc. 116, pp. 7–8, 10.)  In reviewing the cases cited by the Government, the court notes that the Third Circuit Court of Appeals has not relied on the Government's cited cases to date.  Therefore, this court will not rely on these cases, and will instead rely on cases decided by or cited by the Third Circuit.  The court will not consider this element for the additional reason that it does not clearly support the reason for the "ruse exception," which is to avoid federal and state authorities agreeing to detain a defendant in state custody until federal authorities are ready to file a criminal charge.

with civil authorities to detain an individual pending criminal charges, such that the primary or exclusive purpose of civil detention is to hold the individual for future prosecution").  The court will treat the "ruse exception" as having two separate elements, both of which need to be proven in order for Hopkins to succeed.

When Hopkins' original motion was filed, he argued that he was the subject of a federal investigation conducted by TFO Bates, a federal task force officer, who was working with AUSA Baer, a federal prosecutor; the investigation utilized a federal CI; and TFO Bates obtained and executed a federal search warrant.  (Doc. 103, p. 8.)  Additionally, Hopkins argued that his state case was not actively pursued, and the state government was not prepared to prosecute the case, demonstrating that the state charges were merely a ruse for the federal charges. (*Id.* at 8–9.)  The Government argued that following the execution of the search warrant, the investigation did not meet the initial expectations and it was less likely than initially anticipated that Hopkins would be indicted.  (*Id.* at 9.)  Further, the Government asserted that TFO Bates was prepared to attend the preliminary hearing and participate in the prosecution of the state charges, thus Hopkins failed to establish that collusion took place, let alone collusion with the primary purpose of circumventing the Speedy Trial Act.  (*Id.* at 9–10.)

Following the first hearing and based on the record evidence, the court concluded in its prior opinion that the facts in this case made the application of the

"ruse exception" colorable: the investigation began at the federal level; federal

authorities obtained a federal wiretap; federal agents utilized a CI who was

working with federal agents; and federal authorities applied for, obtained, and

executed a federal search warrant. (*Id.* at 10–11.) The only nexus to the state was

TFO Bates, who is also a police officer for the City of Harrisburg. (*Id.* at 11.)

TFO Bates filed state charges after a conversation with AUSA Baer. (*Id.*)

Additionally, the court noted that Hopkins' case languished at the state court level

for several months with little to no action being taken. (*Id.*) Ultimately, the court

concluded that due to the exacting standard to be applied and ADA Varley's and

TFO Bates' testimony about their intent to follow through with the state charges,

Hopkins failed to demonstrate that he was held in state custody for the sole or

primary purpose of preparing federal criminal prosecution. (*Id.* at 12.)

Additionally, the court concluded that Hopkins did not make a sufficient showing

that the requisite level of collusion was present. (*Id.* at 13.) In so concluding,

however, the court noted that the circumstances presented a close call. (*Id.*)

The newly disclosed information that prompted the reconsideration of the

court's prior ruling on the motion to dismiss is the following bail recommendation

TFO Bates made in relation to the state charges: "Affiant requests high bail on

defendant due to the nature of the charges and the defendant is being federally

indicted. If convicted would be looking at a 15 year mandatory sentence. The

defendant does have knowledge of this and does put him at a flight risk." (Doc. 106, p. 9.)

In the court's first opinion resolving Hopkins' motion to dismiss, the court made a factual finding that the issue of whether "the USAO would file federal charges remained an open question at the time of Hopkins' arrest on the state charges." (Doc. 103, p. 3.) The Government made that assertion in its brief in opposition to Hopkins' motion. (Doc. 68, p. 3 n.1.) The court's finding that it was an open question was supported by TFO Bates' testimony at the first hearing, in which he explicitly stated that he intended to pursue the state charges if Hopkins was not charged federally, and his testimony relating to his conversation with AUSA Baer about the charging decision. (Doc. 103, pp. 11–12.) TFO Bates' testimony during the first hearing about his conversation with AUSA Baer was as follows:

> Q: Was Mr. Hopkins actually arrested after the execution of the warrant?
>
> A: Yes.
>
> Q: Who made the decision to file charges?
>
> A: State charges?
>
> Q: Yes.
>
> A: Ultimately I would have been the one to make that decision, but I spoke to AUSA Baer about the case, and he told me to go ahead and do the state charges.

Q: Okay.  And did he tell you that — and I don't want you to speculate, but if you had a specific conversation about it, was he telling you that — why did he tell you that based on your perception?

A: Well, this was still an ongoing investigation.  A search warrant in itself, you're searching for evidence.  There was no talk about having a grand jury set up or indicting him right then and there.

We didn't know what we were walking into from that search warrant. We could have walked into absolutely nothing.  Mr. Hopkins may not even have been home.  So once we obtained evidence, at that point we knew somewhat of what was going on.

There was still more of an investigation on the firearms, finding out where they're from, finding out if they're functionable, sending them for testing, things like that.

Q: And you, in fact, did go file a complaint?  You personally did that?

A: Yes.

Q: Was your superior at the ATF involved in that decision at all?

A: Yes.

Q: What was your understanding, what was your intent when you filed the state criminal complaint against Mr. Hopkins?

A: My intent was if we did not have enough to charge him federally, that we would go through with the state process.

(Doc. 102, pp. 46–48)

Additionally, at the first hearing, TFO Bates was specifically questioned about whether he had any discussions regarding the possibility of a federal indictment.  TFO Bates' testimony was as follows:

Q: I eventually was assigned the case in this matter and contacted you sometime around May or June of 2021.  Correct?

13

A: Yes.

Q: And there was a grand jury that was set up for Mr. Hopkins' case at that point.  Correct?

A: Yes.

Q: Prior to that, was there any communication you had with my office from anybody about indicting Mr. Hopkins' case?

A: No.

Q: Did you ever, with Mr. Baer, discuss a charging document, a charging decision at the federal level that would involve charging Mr. Hopkins with a federal crime?

A: No.

Q: Again, my final question is that, is it your experience, based on being a task force officer, that the U.S. Attorney's Office will always indict these cases when you bring them when we have a federal warrant?

A: No, it doesn't always happen.

(*Id.* at 48.)

That prior testimony is directly contradicted by the written bail

recommendation TFO Bates submitted to MDJ Johnson prior to Hopkins'

arraignment on February 19, 2021.  Therefore, at the second evidentiary hearing in

which the record was re-opened on this matter, Hopkins' counsel questioned TFO

Bates about the bail recommendation.  TFO Bates testified as follows:

Q: So, now, throughout the course of the investigation, you were — you're communicating with Mr. Baer.  Correct?

A: Yes.

14

Q: And I know there was a document that reflected that he and his staff were sending requests for issuance of a search warrant to a federal judge on February 19th of 2021.  Correct?

A: Yes.

Q: Or not February 19th, I don't mean to mislead you, February 11th, I believe, of 2021.

A: Yes.

Q: And after it was issued, did Mr. Baer tell you about you now have a warrant?

A: Yes, he would have.

Q: Okay.  And did you talk before the 19th with him, like, hey, what's going on, have you done the warrant yet, have you executed it or what's the game plan?  Did you have those conversations?

A: Once I typically get a warrant, I don't really discuss it with the attorney until I execute it.

Q: Okay.  Now, the day you executed it, you then reported back to Assistant District Attorney Baer — I'm sorry, Assistant United States Attorney Baer?

A: Yes.

Q: And in that conversation, you — let me say this.  The purpose of the search, and you were working with the ATF, was to go in and develop evidence of illegal possession of firearms.  Correct?

A: Yes.

Q: And you went in, and as a result of the research, there were firearms in there that you had believed that were illegally possessed by Mr. Hopkins.  Correct?

A: Yeah.

Q: So you were conducting an investigation into that, the very things that you found?

A: Correct.

Q: And you already knew that you had approval to charge him federally at some point?  I mean, in other words, your superiors, this was an individual worthy of conducting an investigation upon?

A: Yeah, the ATF side, yes.

Q: And so you had a very, very good, firm belief that after finding those firearms, that Mr. Hopkins, as of February 19th of 2021, was going to be indicted federally?

A: I wanted him to, that's my whole purpose of doing that, but I also knew that I can't make that decision.

Q: Well, you don't make that decision.  Right?  Like, you — that's a decision ultimately that the United States Attorney's Office, with your assistance, they make.  Correct?

A: Yes.

Q: And you wouldn't tell a judge that he is being federally indicted on your own without talking to the United States Attorney, would you?

A: No, no, I wouldn't.

Q: So it was only after you had the conversation with the Assistant United States Attorney that you then related to Judge, I think it was Judge Johnson who was setting bail, that he would be federally indicted. Correct?

A: Yes.

Q: So you had a conversation with Mr. Baer, and after that conversation, you felt comfortable relating to the state court judge, set bail high because he is being federally indicted.  Correct?

A: Yes.

(Tr. at 33–36.)[6]  Later during cross-examination, TFO Bates again unambiguously

testified that he only made the bail recommendation after consultation with AUSA

Baer:

> Q: And I understand how that works, but ultimately, regardless of who
> set bail, the purpose of telling him about the pending — he is being
> federally indicted is because you want bail set high so he couldn't make
> it and he would remain incarcerated until you got around to indicting
> him.  Correct?
>
> A: Yes and no.  I ultimately — I wanted him indicted, but if it didn't go
> that route, at least he stayed in the state.  I wanted the bail to be high
> because of not just that, you know, his history, there were other
> elements involved.
>
> But I mean, that's typically what the officers do for the bail
> recommendation, is put their recommendation on — and it doesn't
> always — the judges don't always go by what the officer said, but this
> situation they did.
>
> Q: I mean, I know you've just told us your reasons for setting it high,
> but you didn't tell Judge Johnson about his prior criminal history?
>
> A: No, no.
>
> Q: And I think as we said before, you wouldn't have said any of that to
> the — written that to the judge unless you first spoke with the Assistant
> United States Attorney you were working with.  Correct?
>
> A: No, I spoke more with — like, that information would have came
> from the agents that I worked with.  A.U.S.A. Baer really didn't put too
> much into it because he didn't really — he wasn't involved with the
> case much since it just got handed over and he really didn't read into it.
> He only got what I spoke to him about the chain of — you know, what

---

[6] The court obtained a rough transcript of the second evidentiary hearing from the court reporter
for the purpose of issuing this opinion as quickly as possible given the impending trial date in
this case.

took place.  Like, the 15-year mandatory would have came from agents that had given me their experiences and —

Q: I guess what I was — and I appreciate that answer because there are a couple pieces of information.  I was just centering on "is being federally indicted."  Forget about —

A: Yes, I see.

Q: You wouldn't have told the judge, hey, he's getting indicted federally, unless you talked to the U.S. Attorney —

A: Correct.

Q: — and that gave you the confidence to be able to relate that information to the judge?

A: Correct.

(*Id.* at 40–42.)

TFO Bates' contemporaneous bail recommendation and testimony during the second hearing starkly contradicted his prior testimony.  Consequently, the court questioned TFO Bates about the seemingly irreconcilable testimony.  The court pointed TFO Bates to a portion of the transcript from the first hearing, reviewed his prior testimony with him, and the following exchange occurred:

Q: So that was your prior testimony.  But on the date when you arrested Mr. Hopkins, you prepared a bail recommendation for the magisterial district justice presiding telling that magisterial district justice that Mr. Hopkins "is being federally indicted."

A: Yes.

Q: Did I read that correctly?

A: Yes.

18

Q: And in response to Mr. Abom's question a moment ago about whether you would have made such a definitive statement to a judge in writing without authorization from the U.S. Attorney's Office, your answer — I can read it back — was no, I would not have.

A: Yes.

Q: So what did Mr. Baer tell you about returning an indictment, and why is this answer different from the answer you provided before?

A: The answers before, as I took the questions before, were did we actually sit down and talk to somebody saying, yep, we'll indict them on this charge, this charge.

When I built this case, I was under the impression that — if this would go the way it would go, I would do these federal charges. Those are the charges I put into the Enforce, our computer system that collects the basic information, the reports. That was my impression.

And then when I talked to A.U.S.A. Baer about the case, I was under the impression with him that he liked it and the fact that Eric Pfisterer, the deputy chief at the time, liked it, as well, my impression was he's ultimately going to be federally indicted.

I left that bail recommendation because I had my discussion with Mr. Hopkins being that the ATF was investigating him on federal charges, that his impression was that he was being indicted, I was in fear that if he was out, he would flee.

That is why I answered the way I did initially. My impression was, the way he was asking me the question, did I actually talk to somebody that said that he was — he is being indicted, no, no. I was under the impression that even if I present the case to Johnny Baer, he could still say there's not enough here, so keep it in the state.

Q: That leaves me confused, because just a moment ago — so in the first hearing you said, no, the word "indictment" basically was not used, it was impressions, it was my understanding, I thought eventually we'd get to an indictment, but we weren't there yet.

But just a moment ago Mr. Abom asked you, before telling a magisterial district judge that someone is being federally indicted, would you need to have authorization from the A.U.S.A. to make such a definitive statement, and you said yes.

A: Okay.

Q: So you leave me confused.

A: I was under the impression meaning, like, to indict somebody, yes. I didn't — not just to say it, that you're going to be indicted.

Q: Well, you didn't use the word "may."

A: No.

Q: You didn't say is possibly being federally indicted.

A: No, I did not.  No, I did not.

Q: It's without qualification when you told the MDJ that Mr. Hopkins is being federally indicted.

A: Yeah, and I put that because I was under the impression.  That could have been wrong to put, but that's my impression when I had the discussion with Eric Pfisterer and A.U.S.A. Baer, that the case is being handled by the U.S. Attorney's Office, an indictment will happen.

(Tr. at 46–48.)

The court is unable to reconcile the conflicting testimony TFO Bates provided during the two evidentiary hearings.  In response to questions about the same phone call with AUSA Baer on the day when Hopkins' home was searched and he was arrested, TFO Bates provided diametrically-opposed answers, fatally undermining his credibility on this subject.  His attempt to reconcile the conflicting testimony upon questioning by the court was not convincing.

Thus, the court can no longer rely on TFO Bates' testimony from the first hearing about the conversation with AUSA Baer or his description of his intention in filing the state charges.  Accordingly, the more credible evidence upon which to rely is the written bail recommendation, made contemporaneously with the arrest of Hopkins, along with TFO Bates' testimony during the second hearing after the discovery of his bail recommendation.  This new evidence sheds significant light on TFO Bates' intention in filing the state charges and is the sole credible evidence on this fact that lies at the heart of the inquiry.  The court now concludes, in light of this evidence, that the state charges were filed for the primary or sole purpose of preparing a federal criminal prosecution against Hopkins because that is the only logical inference based on what TFO Bates said to Magisterial District Justice Johnson on February 19, 2021 in his bail recommendation.

Next, the court turns to the collusion element.  Collusion is defined as a "secret agreement between two or more persons for an illegal or deceitful purpose."  *See* https://merriam-webster.com/dictionary/collusion.  The court will review the evidence to determine if Hopkins has established collusion in this case based on the ordinary dictionary definition of the term.  Given TFO Bates' directly conflicting testimony about why state charges were filed during the two hearings, as well as the discovery of TFO Bates' written bail recommendation, the court does not find TFO Bates' initial explanation credible.  Accordingly, the sum of the

21

credible evidence before the court on the issue of collusion is limited to TFO

Bates' contemporaneous written bail recommendation and his testimony at the

second hearing after this document was discovered and reviewed.  In his testimony

at the second hearing, TFO Bates explained that he spoke on the phone with AUSA

Baer and was instructed to file state charges after receiving confirmation in some

form that a federal indictment would be returned against Hopkins.

TFO Bates then submitted a written bail recommendation to Magisterial

District Justice Johnson advising him that Hopkins was going to be federally

indicted and Hopkins had knowledge of the indictment and potentially lengthy

federal sentence, making him a flight risk.  For these reasons, TFO Bates requested

high bail.  Notably absent from the record is any testimony or statement from

AUSA Baer about the phone call with TFO Bates.  Thus, there is no evidence

refuting TFO Bates' testimony during the second hearing that he would not have

explicitly advised a judge in writing that a defendant was being indicted without

receiving approval from the United States Attorneys Office.  TFO Bates' testimony

at the second hearing describing his phone call with AUSA Baer is consistent with

his written bail recommendation.

Bail was set at $250,000.00, which Hopkins was unable to post.  Hopkins

was then held in state custody, without a preliminary hearing, for more than four

months, until he was arraigned and detained on the federal indictment.  At that

point, the state charges were promptly dismissed at the next scheduled preliminary hearing date for Hopkins following his initial appearance in federal court.

On this record, having received no evidence to the contrary, the court is constrained to find collusion between TFO Bates and AUSA Baer. The court has already determined that there was an agreement to file state charges in order keep Hopkins detained until a federal indictment could be returned. The sequence of events that have unfolded with respect to Defendant's motion to dismiss leads the court to conclude that there was a secretive and deceitful element to this agreement. Specifically, TFO Bates testified at the first hearing that he made the decision to file state charges after speaking with AUSA Baer. That testimony has remained consistent. However, importantly, at the first hearing, TFO Bates said that there was <u>no</u> discussion with AUSA Baer or anyone else about indicting Hopkins. At the first hearing, TFO Bates did not provide information about his bail recommendation to state authorities. Then, at the second hearing, after he discovered and produced his contemporaneous written bail recommendation to the Government, TFO Bates provided completely different testimony. In the second hearing, he testified that it was always his intention to indict Hopkins federally, and he received confirmation that an indictment would be returned during his call with AUSA Baer. On that basis, he recommended that state authorities set high bail to ensure Hopkins would remain detained pending the federal indictment.

Unfortunately, that detention continued for more than four months before an indictment was filed.  The fact that TFO Bates failed to explain the true purpose for filing the state charges and seeking state detention at the first hearing leads the court to conclude that these actions were done secretively and with the intention to deceive.

Thus, having reviewed and considered the new evidence presented, the court concludes that Hopkins has adequately demonstrated that the "ruse exception" applies, as he was held in state custody for the sole or primary purpose of preparing a federal criminal prosecution and there was collusion between federal and state officials to circumvent the Speedy Trial Act.

Applying the "ruse exception," the Government was required to file an information or indictment charging Hopkins within thirty days from the date on which he was arrested under 18 U.S.C. § 3161(b).  Hopkins was arrested on February 19, 2021 and was not indicted until June 23, 2021, which was far too late. The remedy for a violation of § 3161(b) is dismissal.  *See* 18 U.S.C. § 3162(a)(1) ("If, in the case of any individual against whom a complaint is filed charging such individual with an offense, no indictment or information is filed within the time limit required by section 3161(b) as extended by section 3161(h) of this chapter, such charge against that individual contained in such complaint **shall** be dismissed or otherwise dropped.")

However, it is well established that Hopkins is only entitled to dismissal of the offense or offenses charged in the original complaint. *See United States v. Watkins*, 339 F.3d 167, 175 nn.5–6 (3d Cir. 2003) (collecting cases). At the state level, Hopkins was charged with one count of Person Not to Possess a Firearm and two counts of Receiving Stolen Property. (Doc. 67-6, p. 4.) The charges of Receiving Stolen Property was premised on the fact that two of the firearms found in Hopkins' residence had previously been reported stolen. (*Id.*; Doc. 102, p. 49.) In contrast, the indictment in this case charges Hopkins at Count 1 with distribution of a controlled substance, namely cocaine base, and at Count 2 with Felon in Possession of a Firearm and Ammunition. (Doc. 1.) The firearms Hopkins was charged with possessing in Count 2 of the indictment are the same firearms he was charged with possessing in the state court criminal complaint. Therefore, the result of applying the "ruse exception" and finding a violation of § 3161(b), is that Count 2 of the Indictment will be dismissed.

## B. Speedy Trial Act – 18 U.S.C. § 3161(c)(1)

In the briefing on Hopkins' original motion, he argued in the alternative that § 3161(c)(1) of the Speedy Trial Act was also violated, because he was not brought to trial within 70 non-excludable days from the date of his first appearance before a judicial officer. (Doc. 103, p. 14.) Hopkins' arguments primarily focused on the

reasons continuances were granted by this court following his indictment.  (*Id.*)
The Government offered no specific arguments on this point.  (*Id.*)

The court's prior analysis on this argument was conducted following a
finding that the "ruse exception" did not apply, therefore the beginning date for
purposes of the analysis was the date of Hopkins' first appearance before a judicial
officer of this court, on July 8, 2021.  However, having now found that the "ruse
exception" does apply, the court will analyze anew whether § 3161(c)(1) has been
violated.

The Speedy Trial Act provides, in relevant part, that:

> In any case in which a plea of guilty is entered, the trial of a defendant
> charged in an information or indictment with the commission of an
> offense shall commence within seventy days from the filing date (and
> making public) of the information or indictment, or from the date the
> defendant has appeared before a judicial officer of the court in which
> such charge is pending, whichever date last occurs.

18 U.S.C. § 3161(c)(1).  The failure of the Government to do so must result in the
dismissal of the information or indictment upon motion of the defendant.  18
U.S.C. § 3162(a)(2).

The seventy-day limit, however, is not absolute.  Section 3161(h) of the
Speedy Trial Act sets forth several categories of delay that must be excluded from
the calculation of the seventy-day time frame, including delays: resulting from
other proceedings concerning the defendant; where prosecution is deferred by the

government attorney pursuant to a written agreement; resulting from absence or unavailability of the defendant or an essential witness; resulting from a defendant's mental incompetence or physical inability to stand trial; where the information or indictment is dismissed and defendant is charged with the same offense; resulting from defendant's case being joined for trial with a codefendant; continuances granted by the judge where the judge finds that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial[7]; and where evidence reasonably appears to be in a foreign country.  *See* 18 U.S.C. § 3161(h)(1)–(8).

At the first evidentiary hearing, the court heard extensive testimony relating to the numerous continuances in Hopkins' state court case from arraignment through to dismissal in an effort to establish whether each time period was excludable.  The following information is drawn from the docket sheet for the state case.  Hopkins' preliminary arraignment was held on the same day he was arrested: February 19, 2021.  (Def. Ex. 8, p. 12.)  Hopkins' preliminary hearing was initially scheduled for March 22, 2021.  (*Id.*)  The preliminary hearing was continued until April 26, 2021, with the reason listed as "Other" and showing that the continuance

---

[7] In addition to the case law cited in this court's first opinion resolving the instant motion, continuances granted under § 3161(h)(7)(A) are not excludable if the continuance is granted "because of *general congestion of the court's calendar*, or lack of diligent preparation or failure to obtain available witnesses on the part of the attorney for the Government."  18 U.S.C. § 3161(h)(7)(C) (emphasis added).

was requested by Magisterial District Judge O'Leary. (*Id.*) The docket shows that the hearing was again continued at MDJ O'Leary's request until May 10, 2021, with a continuance reason of "Defendant Not Ready." (*Id.*) The next entry shows a continuance requested by MDJ O'Leary, re-scheduling the hearing for June 28, 2021, with the reason being "Joint Request for Continuance." (*Id.*) The docket then shows that the preliminary hearing was continued to July 26, 2021 at the request of the Commonwealth of Pennsylvania with a continuance reason of "Other." (*Id.*) Ultimately, the charges were withdrawn on the July 26 hearing date. (*Id.* at 13.)

It is clear that the time from Hopkins' preliminary arraignment on February 19, 2021 through the first date his preliminary hearing was scheduled on March 22, 2021, is not excludable. Additionally, it is likewise clear that the first continuance from March 22, 2021 to April 26, 2021, requested by MDJ O'Leary, with no specific reason listed, is not excluded. The time from February 19, 2021 through April 26, 2021 totals sixty-six days. Although the reasons listed for the next two continuances—defendant not ready and joint request for continuance—are in conflict with testimony elicited at the first hearing, *see* Doc. 102, pp. 30–34, 88–91, it is not necessary for the court to resolve the question of whether that time is excludable. The Government has already conceded that the twenty days between Hopkins' initial arraignment in federal court on July 8, 2021 and the filing of the

first motion to continue on July 28, 2021 is non-excludable time.  (Doc. 68, p. 5.)

Therefore, it is apparent when applying the "ruse exception" that more than

seventy days elapsed between Hopkins being charged and seen by a judicial officer

in state court and his trial.  Thus, Hopkins has also demonstrated that § 3161(c)(1)

was violated, and dismissal of Count 2 is required for this reason as well.

### C. Dismissal With Prejudice

The violations of subsections 3161(b) and 3161(c)(1) require dismissal of

Count 2.  *See* 18 U.S.C. § 3162(a)(1)–(2).  Both subsections include the same

language to guide courts when determining whether to dismiss the case (or count)

with or without prejudice: "the court shall consider, among others, each of the

following factors: the seriousness of the offense; the facts and circumstances of the

case which led to the dismissal; and the impact of a reprosecution on the

administration of this chapter and on the administration of justice."  *Id.*  The

Supreme Court has explained that the "district court must carefully consider th[ese]

factors as applied to the particular case and, whatever its decision, clearly articulate

their effect in order to permit meaningful appellate review."  *United States v.*

*Taylor*, 487 U.S. 326, 336 (1988).

Hopkins concedes that the first factor—the seriousness of the offense—

weighs against him.  (Doc. 67, p. 12.)  Hopkins argues, however, that the second

and third factors weigh heavily in his favor.  (*Id.* at 12–15.)  Although the

Government vigorously argued that the indictment should not be dismissed, the Government presented no argument regarding whether a dismissal should be with or without prejudice.

The Third Circuit has held that drug and firearm charges are serious.  *See United States v. Stevenson*, 832 F.3d 412, 420 (3d Cir. 2016) (collecting cases). Therefore, the first factor clearly weighs in favor of the Government.

Analysis of the second factor requires courts to consider the reasons for the delay and ask whether it stemmed from "intentional dilatory conduct," "a pattern of neglect on the part of the Government," or rather, from a "relatively benign hitch in the prosecutorial process."  *Id.*  Bad faith is not a prerequisite to dismissal with prejudice.  *See United States v. Bert*, 814 F.3d 70, 80 (2nd Cir. 2016).  A pattern of neglect either on the part of the government or the court may alone be sufficient to tip the "facts and circumstances" factor in favor of dismissal with prejudice.  *Id.*

Here, the court agrees with Hopkins that the facts and circumstances surrounding the delay cannot be classified as a "benign hitch in the prosecutorial process."  Rather, the court finds a pattern of neglect and dilatory conduct. Hopkins' case was neglected by the local prosecutor and the Magisterial District Justice for several months at the state level prior to the federal indictment.  The United States Attorney's Office was dilatory in not seeking an indictment for four

months after Hopkins was arrested and detained given that bail was set high by the

Magisterial District Justice based on the representation by TFO Bates that a federal

indictment would be filed.  No explanation has been provided for that delay.  The

court acknowledges the possibility that the United States Attorney's Office may

have intended to quickly return a federal indictment after Hopkins was detained on

state charges.  But the fact remains that more than four months elapsed between the

filing of state charges and Hopkins' indictment.  While the cause of that delay is

unknown because the court heard no direct testimony from the United States

Attorney's Office, the record evidence demonstrates that little to no additional

investigation was conducted on the drugs and firearms giving rise to the federal

charges in the intervening months between Hopkins' arrest and the date an

indictment was filed.  (Doc. 102, pp. 47, 49, 63–64.)  Rather, the testing of the

drugs and firearms were conducted *after* Hopkins was indicted.  (Docs. 86, 86-1,

112, 112-2.)  Absent any direct explanation for the delay, circumstantial indication

that additional investigation was being conducted prior to returning an indictment,

or some other obstacle arising that impeded the federal prosecution, the court

concludes that the delay was intentional.

Accordingly, the court concludes that the delay was due to both neglect and

intentional dilatory conduct, but not necessarily bad faith.  The federal

prosecution's unexplained delay, coupled with the delays at the state level, resulted

in Hopkins' detention for a significant period of time without a preliminary hearing on the state charges or a federal indictment being filed.  Therefore, the second factor weighs in favor of Hopkins.

The main considerations for the third factor are "whether the defendant suffered actual prejudice as a result of the delay and whether the government engaged in prosecutorial misconduct that must be deterred to ensure compliance with the [Speedy Trial] Act."  *Stevenson*, 832 F.3d at 421–22.  The Supreme Court has noted that length of delay is a consideration in evaluating prejudice.  *See Taylor*, 187 U.S. at 340 ("[t]he longer the delay, the greater the presumptive or actual prejudice to the defendant, in terms of his ability to prepare for trial or the restrictions on his liberty") (citing *Barker v. Wingo*, 407 U.S. 514, 537 (1972)).  Courts also look to whether the violation of the Speedy Trial Act undermined a defendant's ability to prepare for trial or ability or to mount an effective defense, such as witnesses or evidence becoming unavailable as a result of the delay.  *Stevenson*, 832 F.3d at 422.  Where the government's conduct is unintentional, "penalizing the government for the delay [would not appreciably] deter any similar behavior in the future."  *Id.*  Finally, "[w]hen the charges are serious, courts should impose the sanction of dismissal with prejudice only for a correspondingly serious delay, especially in the absence of a showing of prejudice."  *Id.* at 422–23 (quoting *United States v. May*, 819 F.2d 531, 534 (5th Cir. 1987).

In his post-hearing brief in support, Hopkins argues that it is now clear that this case was always going to be a federal one, and that he suffered severe prejudice during the 126 days he spent in custody awaiting the federal indictment. (Doc. 111, p. 7.)  Hopkins asserts that every minute he spent in what was essentially federal custody at Dauphin County Prison was prejudicial and that the court should not condone the Government's misbehavior and violation of the Speedy Trial Act in a way that would allow them to engage in the same conduct in the future.  (*Id.* at 7–8.)

In this court's prior opinion in the context of Hopkins' Sixth Amendment Speedy Trial argument, the length of delay in this case was more than sufficient to establish presumptive prejudice.  (Doc. 103, pp. 18–19.)  In analyzing Hopkins' prejudice arguments, the court explicitly noted that pursuant to *Barker*, the prejudice factor weighed only slight in favor of Hopkins, discarding arguments relating to the delay between his state arrest and federal indictment because the relevant time frame was the time "between formal accusation and trial." (*Id.* at 26–28.)  That is no longer the case in this opinion given the application of the "ruse exception."  In light of this ruling, the court will add the time between Hopkins' initial arrest at the state level and indictment to the length of delay.  As a result, the court is persuaded that even absent a more specific showing of prejudice, the significant delay in this case weighs in favor of Hopkins.

Additionally, while dismissal with prejudice does not appreciably deter similar behavior where the government's conduct was clearly unintentional, the court has already concluded that the delay in this case was due to both neglect by state authorities and intentional dilatory conduct by the federal prosecutors. Thus, having already concluded that the record in this case supports a finding of collusion and intentional dilatory conduct, the court concludes that the third factor weighs in favor of Hopkins. A defendant should not be charged in state court with a request for high bail due to a pending federal indictment, and then detained for four months with no preliminary hearing in the state or federal indictment. That is conduct that must be deterred.

In balancing these factors, the first factor weighs in favor of the Government, with the remaining factors weighing in favor of Hopkins. Therefore, Count 2 of the indictment will be dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, Hopkins' motion to dismiss the indictment will be granted as to Count 2 of the indictment. An appropriate order follows.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: April 25, 2023