## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 1:21-CR-00177 |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| REGINALD HOPKINS | : | Judge Jennifer P. Wilson |

## ORDER

Before the court are two motion to suppress evidence filed by Defendant Reginald Hopkins ("Hopkins"). (Docs. 84, 90.) Hopkins alleges that there was no probable cause to justify the search warrant for his residence, and all evidence seized during the search should be suppressed. (Doc. 84.) In Hopkins' supplemental motion to suppress, he challenges the truthfulness of factual statements made in the affidavit of probable cause in support of the search warrant pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). (Doc. 90.) For the following reasons, the court will deny both motions to suppress evidence.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On June 23, 2021, Hopkins was charged by indictment with distribution of a controlled substance, namely cocaine base, in violation of 21 U.S.C. § 841(a)(1), and being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). (Doc. 1.) The firearm charge stems from the February 19, 2021 execution of a search warrant by the Bureau of Alcohol, Tobacco, Firearms,

and Explosives ("ATF") at 100 Evergreen Street, Apt. B1, Harrisburg.  (Doc. 84, p. 2.)[1]  The residence was rented and occupied by Hopkins.  (*Id.*)  During the execution of the search warrant, various items, including firearms, firearm magazines, cellular telephones, paperwork, money, and photographs were seized and/or photographed.  (*Id.*)

Hopkins filed the first motion to suppress, along with a brief in support, on February 1, 2023.  (Docs. 84, 85.)  Hopkins filed the supplemental motion to suppress requesting a *Franks* hearing, along with a brief in support, on February 9, 2023.  (Docs. 90, 91.)  At the court's request, the parties submitted expedited letter briefs on the issue of whether Hopkins made an adequate preliminary showing to demonstrate whether a *Franks* hearing was warranted.  (Docs. 93, 97.)  On February 24, 2023, finding that Hopkins adequately made the necessary preliminary showing, the court issued an order scheduling a *Franks* hearing for March 21, 2023.  (Doc. 99.)  The Government filed a brief in opposition to both motions to suppress on February 23, 2023.  (Doc. 98.)  No reply briefs were filed.

The *Franks* hearing was held on March 21, 2023.  Hopkins filed a post-hearing brief in support of the pending motions on March 31, 2023.  (Doc. 111.)  The Government filed its post-hearing brief in opposition to the pending motions on April 10, 2023.  (Doc. 116.)  Thus, both motions are ripe for review.

---

[1] For ease of reference, the court utilizes the page numbers in the CM/ECF header.

On April 25, 2023, the court issued a memorandum and order granting in part, upon reconsideration, Hopkins' motion to dismiss the indictment.  (Docs. 117, 118.)  The Government filed a notice of appeal from this ruling on May 3, 2023.  (Doc. 120.)  The sole count pending before this court at this time is the distribution of a controlled substance count (Count 1).  (*Id.*)  A date-certain trial has been scheduled for May 22, 2023.  (Doc. 89.)

## DISCUSSION

Hopkins' first motion to suppress argues that, examining the face of the affidavit, there was not adequate probable cause stated to warrant belief that the items sought would be at the location of the search, and all items seized should therefore be suppressed.  (Doc. 84.)

The affidavit of probable cause sets forth the following information: the affiant for the search warrant was ATF Task Force Officer Darrin Bates ("TFO Bates"), a detective for the City of Harrisburg, Bureau of Police, who is cross-designated as a federal agent in order to work with the ATF.  (Doc. 98-1, p. 4.)  An investigation was opened in January 2021 regarding a male known by the street name of "Dreads" after two anonymous tips were sent through the Crime Watch website and information was received from a confidential information ("CI").  (*Id.*)  The two anonymous tips indicated that "Dreads" resided at 100 Evergreen Street in Harrisburg, PA, in an apartment in the basement selling illegal narcotics such as

crack cocaine, synthetic marijuana, and marijuana.  (*Id.*)  The CI also claimed to have seen "Dreads" in possession of firearms on two different occasions in front of the Evergreen Street address.  (*Id.*)

TFO Bates had personal knowledge that the address was a legal rooming house owned by SKYNET Property Management.  (*Id.* at 7.)  TFO Bates obtained a current tenant list for 100 Evergreen Street from SKYNET, which showed one apartment in the basement, which bore the name Reginald Hopkins.  (*Id.*)  TFO Bates showed the CI a picture of Hopkins, who confirmed that Hopkins was the man known to him as "Dreads."  (*Id.*)

On January 15, 2021, Bates arranged a controlled purchase of crack cocaine from Hopkins utilizing the CI, who is a paid informant.  (*Id.*)  The CI was searched prior to the controlled purchase for any evidence of contraband with negative results.  (*Id.*)  The CI was given $250 in government funds for the purchase and was provided with a recording device for the duration of the controlled purchase. (*Id.*)  The CI traveled on foot to the 1200 block of Chestnut Street in Harrisburg, where he contacted Hopkins via cell phone and then walked to the side door located on the south side of 100 Evergreen Street.  (*Id.*)  Before, during, and after the controlled purchase, the CI was monitored by mobile and fixed surveillance units.  (*Id.*)  The CI entered 100 Evergreen Street and met Hopkins, who gave the CI a clear plastic bag containing crack cocaine in exchange for cash.  (*Id.* at 8.)

The CI left the residence and gave the crack cocaine to TFO Bates. (*Id.*) The CI was searched for money and/or contraband with negative results. (*Id.*) TFO Bates reviewed the audio recording from the controlled purchase in which the CI and Hopkins spoke to each other, and at the end of the transaction, Hopkins said: "I got to go on a coke run, when I go on a coke run, I will be situated." (*Id.*)

On January 27, 2021, TFO Bates and the CI attempted to conduct another controlled purchase of crack cocaine from Hopkins. (*Id.* at 9.) The CI was searched prior to the controlled purchase and was given two hundred fifty dollars in government funds for the purchase, as well as a recording device. (*Id.*) The CI again traveled on foot to the 1200 block of Chestnut Street in Harrisburg and was monitored by mobile and fixed surveillance units. (*Id.*) Surveillance units observed Hopkins coming from the south side of 100 Evergreen Street, where the door is located. (*Id.*) The CI contacted Hopkins and had a brief conversation with him before returning to TFO Bates. (*Id.*) TFO Bates reviewed the audio recording afterward. (*Id.*) TFO Bates' interpretation of the conversation was that Hopkins did not have any product because he was "ripped off" and was laying low until he found a dealer that had good quality product that he could sell. (*Id.*)

On February 4, 2021, TFO Bates again attempted a controlled purchase of crack cocaine from Hopkins utilizing the CI. (*Id.*) The CI was searched prior to the controlled purchase and was given two hundred fifty dollars in government

funds for the purchase, as well as a recording device.  (*Id.* at 11–12.)  The CI again

traveled on foot to the 1200 block of Chestnut Street in Harrisburg and was

monitored by mobile and fixed surveillance units.  (*Id.* at 12.)  The CI contacted

Hopkins, advising that he was at the door and asked if Hopkins "was good."  (*Id.*)

Hopkins told the CI that he did not have anything yet, so the CI returned to TFO

Bates.  (*Id.*)  TFO Bates reviewed the audio recording afterward.  TFO Bates'

interpretation of the conversation was that Hopkins had not yet found a source to

purchase from and that street supply was low.  (*Id.*)  TFO Bates also inferred from

the conversation that Hopkins would contact the CI when he found a connection

with another drug dealer.  (*Id.* at 12–13.)

TFO Bates contacted SKYNET Properties Management again and

confirmed that the basement of 100 Evergreen Street has only one apartment.  (*Id.*

at 13.)  SKYNET also confirmed that the green side door located on the south side

of the building only leads to the basement and can only be accessed from the

inside.  (*Id.*)  TFO Bates researched Hopkins' criminal history and learned that on

April 7, 2006, Hopkins pleaded guilty to 21 U.S.C. § 841(a)(1), possession with

intent to distribute cocaine base, a felony level offense, in the United States District

Court for the Middle District of Pennsylvania, docketed at 1:05-CR-391.  (*Id.*)

Based on this information, TBO Bates averred that he believed there was probable

cause to believe the basement apartment at 100 Evergreen Street was being used to

facilitate drug trafficking in violation of 21 U.S.C. § 841(a)(1).  (*Id.*)  Additionally, based on TFO Bates' training, experience, and participation in this and many other illegal drug and firearm trafficking investigations, as well as conversations with other agents and officers involved in this and other such investigations, TFO Bates averred the following:

    a. It is common for illegal drug traffickers to securely store illegal firearms, firearm accessories, ammunition, firearm-related paperwork, illegal drugs, cutting and processing agents, drug packaging and distribution materials, scales, drug paraphernalia, owe-sheets, bank records, vehicle records and US currency, in their residence or motor vehicle;

    b. It is also commonplace for illegal drug traffickers to hide the above-mentioned items in locked safes and secret compartments and containers;

    c. Illegal drug traffickers often carry and store firearms, most commonly illegal/stolen firearms, in order to protect their person, their residence, their money, and their illegal drug and firearm supply;

    d. Because of the required background checks for firearms transactions, drug traffickers with criminal convictions often request drug users and addicts with no criminal convictions to purchase firearms in the names of the users and addicts and then turn the firearms over to the drug traffickers;

    e. Illegal firearms are frequently received, sold, traded, and exchanged for controlled substances and cash on the street;

    f. Individuals who receive, possess, and sell illegal drugs and firearms use cellular telephones to make contact with associates who supply controlled substances and firearms;

g.  Individuals who receive, possess, and sell illegal drugs and firearms use cellular telephones to make contact with associates who purchase controlled substances and firearms;

h.  Drug and illegal firearm traffickers often have historical records that remain on electronic devices and indicate telephone numbers, photographs and names of contacts who have called or have been called, records of received and sent text message, emails and other forms of communications that are commonly utilized on web-enabled cellular telephones;

i.  Individuals who distribute controlled substances and illegal firearms often use cellular telephones to post photographs and messages on social media of themselves and other individuals in possession of firearms, controlled substances, and cash proceeds from the sales and distribution of those items.

(*Id.* at 13–15.)  Accordingly, TFO Bates averred that he believed there was probable cause to believe that fruits, evidence, and instrumentalities of violations of federal law, including violations of Title 18 U.S.C. § 922(g) and § 924(c) as well as Title 21 U.S.C. § 841(a)(1) were concealed at 100 Evergreen Street in the basement apartment.  (*Id.* at 15.)

At the evidentiary hearing on March 24, 2023, TFO Bates testified that the CI used to conduct the January 15 controlled buy was the only individual who identified the seller of the controlled substance as Hopkins, and that identification formed the basis for multiple averments in the search warrant.  (Tr. at 43).[2]
Additionally, TFO Bates testified that no agents or officers involved in the

---

[2] The court obtained a rough transcript of the second evidentiary hearing from the court reporter for the purpose of issuing this opinion as quickly as possible given the impending trial date in this case.

investigation witnessed, photographed, surveilled, or video recorded any of the controlled buy exchanges, as they took place inside the Evergreen Street residence. (Tr. at 21, 26.)  Finally, there was testimony that the residence on Evergreen Street is a multiple unit building with numerous residences inside, accessible from the side entrance used during the controlled buy  and subsequent attempted controlled buys.  (Tr. at 25–27.)

Hopkins also testified at the evidentiary hearing on March 24, 2023. Hopkins testified that he was not the individual involved in the sale of crack cocaine on January 15, 2021.  (Tr. at 56.)

### A. Facial Challenge to Affidavit of Probable Cause

The United States Constitution guarantees that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. AMEND. IV.  "To find probable cause to search, there needs to be a 'fair probability that contraband or evidence of a crime will be found in a particular place.'"  *United States v. Burton*, 288 F.3d 91, 103 (3d Cir. 2002) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).  Probable cause is a "fluid concept" that is fact-specific and "not readily, or even usefully, reduced to a neat set of legal rules."

*United States v. Jones*, 994 F.2d 1051, 1056 (3d Cir. 1993) (quoting *Gates*, 462 U.S. at 232).

Where a court is presented with a challenge to a magistrate judge's determination of probable cause in the issuance of a warrant, it must limit its review to an inquiry of whether "the magistrate had a substantial basis for concluding that probable cause existed." *Id.* at 1055. Although "[a] magistrate's determination of probable cause should be paid great deference by reviewing courts," *Gates*, 462 U.S. at 236, a reviewing court "should [not] simply rubber stamp a magistrate's conclusions." *United States v. Zimmerman*, 277 F.3d 426, 432 (3d Cir. 2002). The court must read the affidavit of probable cause submitted in support of the search warrant in its entirety and "in a commonsense and nontechnical manner." *United States v. Whitner*, 219 F.3d 289, 296 (3d Cir. 2000) (citing *United States v. Conley*, 4 F.3d 1200, 1206 (3d Cir. 1993)). "In making this determination, the Court confines itself 'to the facts that were before the magistrate judge, i.e., the affidavit, and [does] not consider information from other portions of the record." *Id.* (quoting *Jones*, 994 F.2d at 1055).

To deter constitutional violations, the exclusionary rule requires that evidence derived from such violations may not be used at trial—this is the "fruit of the poisonous tree" doctrine. *United States v. Pelullo*, 173 F.3d 131, 136 (3d Cir. 1999) (citations omitted). Because the purpose of this doctrine is deterrence, that

purpose would not be served by excluding evidence that is derived "when law enforcement officers have acted in objective good faith." *See United States v. Leon*, 468 U.S. 897, 907–08 (1984).

### 1. Staleness of the Information in the Affidavit of Probable Cause

First, Hopkins notes that the affidavit depends on a single controlled buy that occurred 27 days before the application for the search warrant and 35 days before the execution of the search warrant. (*Id.* at 3.) The second two attempts to conduct a controlled buy were both unsuccessful and they were 23 and 15 days before the execution of the search warrant. (*Id.*) Hopkins points to a Third Circuit case in which the court indicated that a lapse of a month might be significant if the items are of a volatile or fugitive nature, such as narcotics or stolen cars. (*Id.* at 4, n.2.) Additionally, Hopkins notes that staleness can be overcome by evidence that the activity was of a continuous and ongoing nature, which was not present here, as evidenced by the failed second and third controlled buy attempts. (*Id.* at 4–5.) Therefore, Hopkins contends that the age of the information and the fact that the second and third attempted controlled buys were unsuccessful negate the probable cause that existed following the first controlled buy on January 15, 2021. (*Id.* at 4.)

In response, the Government focuses on the conversations between Hopkins and the CI during the second and third attempted controlled buys, arguing that where there is a course or pattern of ongoing and continuous criminal acts

occurring, the age of the information becomes less important.  (Doc. 98, pp. 6–7.) Specifically, the Government argues that Hopkins told the CI that he was planning to acquire more cocaine that would be available for sale once he found a source and never disavowed his drug-dealing activities or indicated that he wouldn't sell to the CI, thus demonstrating a continuing course of conduct.  (*Id.* at 7.)

It is clear from an examination of the information contained within the affidavit of probable cause that there was a course or pattern of ongoing and continuous criminal acts occurring.  Specifically, during the attempted controlled buy on January 27, 2021, the person who was identified as Hopkins stated, "I'm working on it when I know something I will let you know" and "I will get with you, I'm working it."  (Doc. 98-1, p. 10.)  Additionally, during the attempted controlled buy on February 4, 2021, the person who was identified as Hopkins stated, "Nope, can't find it, they struggling out here, staying in my lane till something pop up."  (*Id.* at 12.)  Given the context in which these statements were made, it is clear that Hopkins was attempting to locate and purchase more drugs, but had been unable to do so.  Thus, this clear demonstration of a course or pattern of ongoing and continuous criminal activity overcomes the staleness of the information relating to the first controlled buy.

## 2. The Reliability of Information Provided by the CI

Hopkins' second argument is that TFO Bates relied on the information the CI provided, as well as the anonymous tips, without providing any information in the affidavit as to the reliability of the CI. (Doc. 85, p. 6.) Hopkins argues that absent any indicia of reliability of the CI, it is unreasonable to give any weight to the CI's information when determining probable cause. (*Id.*)

In opposition, the Government argues that when police receive information from an informant for the first time, they have a duty to independently corroborate at least some of the information the informant provides. (Doc. 85, p. 8.) Here, the Government contends that the information provided by the CI was corroborated through the controlled buy and attempted controlled buys that were monitored, supervised, and recorded by law enforcement, and the affidavit therefore contained sufficient information regarding the veracity of the informant. (*Id.*) Additionally, officers confirmed Hopkins' identity and the rental of the basement apartment. (*Id.* at 9.) Finally, the Government notes that the CI successfully purchased drugs from Hopkins at the specified residence less than one month prior to securing the search warrant and during two subsequent attempts, Hopkins confirmed that he intended to engage in further sales once he found a new supply source. (*Id.*) Therefore, the Government argues that law enforcement independently corroborated the information provided by the CI, thus establishing the CI's reliability. (*Id.*)

Probable cause may exist when a known informant of proven reliability provides a tip regarding criminal activity, particularly when innocent aspects of that tip are independently corroborated by police. *See Draper v. United States*, 358 U.S. 307, 313 (1958); *United States v. Ritter*, 416 F.3d 256, 263–64 (3d Cir. 2005). That is precisely what occurred here. In addition to two anonymous tips, law enforcement also received information from a CI who stated that he saw a male who goes by the street name of "Dreads" in possession of firearms in front of 100 Evergreen Street in Harrisburg on two different occasions. (Doc. 98-1, pp. 6–7.) TFO Bates then obtained a tenant list for that property, confirming that Reginald Hopkins resided in the only basement apartment. (*Id.* at 7.) The CI then viewed a picture of Hopkins and identified him as the male known as "Dreads." (*Id.*) It is true that the affidavit of probable cause does not state that TFO Bates has worked with the CI before and knows him or her to be credible. However, as accurately asserted by the Government, innocent aspects of the tips and information provided by the CI were independently corroborated by TFO Bates prior to the application for the search warrant. Therefore, there were indicia of reliability as to the CI's information and the CI's statements will not be disregarded when examining whether probable cause existed.

### 3.  Examination of the Totality of the Circumstances

Hopkins contends that the staleness of the initial controlled buy, the lack of evidence of an ongoing criminal enterprise, and the lack of information regarding the reliability of the CI–in combination–prove that the affidavit of probable cause failed to show that Hopkins was engaged in continuous and ongoing drug trafficking and firearm possession.  (Doc. 85, p. 6.)  Furthermore, because the affidavit relied on the assertion that Hopkins was engaged in drug trafficking in order to establish probable cause that he possessed weapons, the affidavit likewise failed to show probable cause to search the residence for firearms.  (*Id.* at 6–7.)  Finally, Hopkins notes that no information was collected during the investigation, including during the three controlled buy attempts, about firearms.  (*Id.* at 7.)

The Government's argument in opposition is that law enforcement had the following information:

1) They had received an anonymous tip that the person living at 100 Evergreen Street was selling narcotics;

2) They had been provided information from a CI that "Dreads," who lived at that residence, was selling narcotics and was in possession of firearms;

3) They confirmed that "Dreads" was Reginald Hopkins and that he lived in the basement apartment at the 100 Evergreen Street address;

4) They confirmed that Hopkins had a 2006 federal conviction for selling narcotics and that he was prohibited from possessing firearms;

5) They successfully purchased 1.7 grams of crack cocaine from Hopkins at the residence, through the use of the CI, during a controlled buy on January 15, 2021 that was supervised by law enforcement and recorded;

6) They had a recording from that same transaction where the defendant indicated that he would sell a larger amount of crack cocaine "the next time"; and

7) They had two additional attempts to purchase cocaine from the defendant where he expressed clear intentions to further sell narcotics once he found a new supplier.

(Doc. 98, pp. 9–10.)  Additionally, the Government asserts that there was substantial evidence to establish probable cause that Hopkins intended to continue to sell drugs once re-supplied even though the second and third controlled buy attempts were unsuccessful.  (*Id.* at 11.)  Therefore, the Government contends that sufficient probable cause existed that the residence would likely contain evidence of firearms, illegal drugs, cutting and processing agents, drug packaging and distribution materials, scales, and drug paraphernalia.  (*Id.*)

   Having found that the evidence of a course or pattern of ongoing and continuous criminal activity overcomes the staleness of the information relating to the first controlled buy, and that the CI's reliability was adequately set forth in the affidavit, the court concludes that there was sufficient probable cause in the affidavit.  Therefore, the court need not address the good faith exception.  The court will deny Hopkins' motion to suppress on this basis.

**B. Challenge to the Accuracy of the Affidavit of Probable Cause**

In *Franks*, the Supreme Court determined that a criminal defendant has the right to challenge the truthfulness of factual statements made in an affidavit of probable cause supporting a warrant subsequent to the ex parte issuance of the warrant.  428 U.S. at 171.

The Court set forth the procedure in *Franks* by which a defendant may overcome the general presumption that an affidavit of probable cause supporting a search warrant is valid.  As a threshold matter, the defendant must make a "substantial preliminary showing" that the affidavit contained a false statement, which was made knowingly or with reckless disregard for the truth, which is material to the finding of probable cause.  *Id.*  If that threshold showing is made, then the defendant must ultimately prove by a preponderance of the evidence at the *Franks* hearing that: (1) the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions were material, or necessary, to the probable cause determination.  *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997) (citing *Franks*, 438 U.S. at 171–72).

The Third Circuit has set forth standards to identify what constitutes "reckless disregard for the truth" regarding both false statements and omissions, as follows:

> In evaluating a claim that an officer both asserted and omitted facts with reckless disregard for the truth, we hold that: (1) omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would want to know; and (2) assertions are made with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting.

*United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006) (quoting *Wilson v. Russo*, 212 F.3d 781, 787 (3d Cir. 2000)).  If the defendant establishes a falsehood or omission in the affidavit that meets this standard, then the defendant must prove by a preponderance of the evidence that "probable cause does not exist under the corrected affidavit" in order to establish the materiality of the falsehood.  *Id.*

When assessing the materiality of a false statement, the court is required to excise the false statement from the affidavit through a redaction process.  *Id.* at 384.  In contrast, when assessing the materiality of an omission, the court must insert the omitted information into the original affidavit.  *Id.*  If the defendant meets this burden, then "the Fourth Amendment requires that . . . the fruits of the search [must be] excluded to the same extent as if probable cause was lacking on the face of the affidavit."  *United States v. Frost*, 999 F.2d 737, 743 (3d Cir. 1993) (quoting *Franks*, 438 U.S. at 156).

Hopkins argues that multiple averments made by TFO Bates in the affidavit were omitted and/or incorrect and/or arguably falsified.  (Doc. 111, p. 8.) Specifically, Hopkins points to the omission of the fact that the sole source of information identifying Hopkins as the individual selling drugs was the CI.  (*Id.*)

Additionally, Hopkins notes that the affidavit specifically states that TFO Bates confirmed that the side door used during the controlled buys only leads to the basement, which is not accurate.  (*Id.*)  Finally, Hopkins contends that while the affidavit states that Hopkins was observed by officers during the attempted controlled buy on January 24, 2021, TFO Bates' testified that no agents or officers ever observed Hopkins during any of the three controlled buy attempts.  (*Id.* at 8–9.)

The Government concedes that the basement entrance used by the CI also provided access to other parts of the residence, but argues that Hopkins resided in the only basement apartment and this misstatement does not impact the validity of the warrant.  (Doc. 116, pp. 13–14.)  Next, the Government argues that there is only one mention in the affidavit of surveillance units observing Hopkins, and it simply says that units observed Hopkins coming from the south side of 100 Evergreen Street, the side of the building where the door is located, and that the CI contacted Hopkins and had a brief conversation.  (*Id.* at 14.)  The affidavit does not state that TFO Bates or any member of the surveillance teams actually observed the attempted controlled buys themselves, so there was no omission.  (*Id.*)  Further, the affidavit makes clear that the interactions between Hopkins and the CI were monitored by audio devices, not video devices or direct observations.  (*Id.* at 14–15.)  As to the fact that the CI was the only individual who directly identified

19

Hopkins, the Government reiterates its arguments relating to the reliability of the CI and the steps the Government took to corroborate the tip information, as well as TFO Bates' efforts to confirm Hopkins' identity through his contacts with SKYNET. (*Id.* at 15.)

The court is not persuaded that any alleged omission relating to the CI's identification of Hopkins is material, let alone that it was made with reckless disregard for the truth. The affidavit details the anonymous tips and information received from the CI and TFO Bates' efforts to research the tenants of the property. The CI's identification of Hopkins is set forth in detail in the affidavit. TFO Bates was not then required to explicitly state that the CI was the only individual to directly identify Hopkins from a photograph.

Additionally, there does not appear to be any false statements or omissions with regard to what law enforcement observed on the dates of the attempted controlled buys. Rather, the affidavit clearly explains that the CI was provided with a recording device, that there was surveillance my mobile and fixed units before, during, and after the attempted controlled buys on the exterior of the residence, and that during each transaction, the CI went *inside* the residence. Additionally, the affidavit sets forth the process of searching the CI before and after the controlled buy attempts, as well as a review of the audio recordings. It is

simply not stated or implied that law enforcement officers physically surveilled the transactions between the CI and Hopkins from inside 100 Evergreen Street.

Hopkins' argument relating to the side door of the residence, however, concerns what appears to be a false statement in the affidavit.  In addition to the portions of the affidavit cited in the Government's brief, the affidavit further states "[TFO Bates] contacted SKYNET Properties Management and confirmed that the basement of 100 Evergreen Street has only one apartment.  *SKYNET also confirmed the green side door located on the south side of the building only leads to the basement* and can only be accessed from the inside."  (Doc. 98-1, p. 13) (emphasis added).  It is undisputed that the testimony at the hearing revealed that this was not accurate.  However, a false statement in a search warrant is not, in and of itself, sufficient to warrant the relief requested here.  For a defendant to demonstrate that a false statement was made with reckless disregard for the truth, he must show that the officer had "obvious reasons to doubt the truth of what he or she is asserting."  *Yusuf*, 461 F.3d at 383.  Here, it is clear that TFO Bates relied on the information he was provided during his second conversation with SKYNET in making this assertion.  Hopkins has not demonstrated that TFO Bates had obvious reasons to doubt the truth of this assertion on the date when he included the information in the affidavit.  Accordingly, the court need not address whether this

false statement was material, as it was not made with reckless disregard for the truth.  The court will deny Hopkins' supplemental motion to suppress on this basis.

CONCLUSION

For the foregoing reasons, Hopkins' motions to suppress evidence will be denied.  An appropriate order follows.

<u>s/Jennifer P. Wilson</u>
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: May 3, 2023