## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 1:21-CR-177 |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| REGINALD HOPKINS | : | Judge Jennifer P. Wilson |

### MEMORANDUM

Before the court is the motion to dismiss the indictment filed by Defendant Reginald Hopkins.  (Doc. 172.)  Hopkins argues that Count 2 of the indictment should be dismissed because "the Government deliberately detained Mr. Hopkins on state charges in order to gain time to gather additional evidence for a federal prosecution, in violation of the Due Process Clause of the Fifth Amendment."  (*Id.*)  For the reasons that follow, the motion will be denied.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This is the court's third time reviewing the facts surrounding the delay between the filing of state charges and a federal indictment in this case.  As such, the court incorporates much of the factual description from its prior opinions.  In deciding the issue in the instant motion, the court reviewed the record from two prior hearings, one on February 2, 2023, and the second on March 24, 2023.  The following facts were developed across both hearings.

### A. Hopkins' Arrest, Detention, and Indictment

In early 2021, the regional office of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") learned that Hopkins was potentially selling narcotics in Harrisburg and that he may be in possession of firearms. (Doc. 68, p. 1.)[1] Based on this information, ATF Task Force Officer Darrin Bates ("TFO Bates"), a police officer for the City of Harrisburg who was cross-designated as a federal agent in order to work with the ATF, opened a federal investigation into Hopkins' alleged criminal activities. (*Id.* at 1–2.) The ATF agents then utilized a confidential information ("CI") to attempt to purchase narcotics from Hopkins. (*Id.* at 2.)

On January 15, 2021, agents, with the assistance of the CI, conducted a controlled purchase of crack cocaine from an individual the CI knew as "Dreads," whom the CI later identified as Hopkins. (Doc. 67-2, p. 4.) The ATF made two subsequent unsuccessful attempts to purchase crack cocaine from Hopkins. (Doc. 68, p. 2.) TFO Bates applied for a search warrant for 100 Evergreen Street, Apt B1 in Harrisburg,[2] on February 11, 2021. (*Id.*; Doc. 67, p. 2.) The search warrant was granted by a federal Magistrate Judge on the same date. (*See* Doc. 67-3.)

---

[1] For ease of reference, the court utilizes the page numbers from the CM/ECF header.

[2] TFO Bates confirmed with SKYNET Property Management that Hopkins' name was on the lease for the basement apartment at this address. (Doc. 67-2, pp. 3–4.) It is also the address where the controlled purchase occurred. (*Id.* at 4–5.)

ATF agents, other officers from Harrisburg Police Department, and TFO Bates executed the search warrant on February 19, 2021.  (Doc. 67, p. 2.)  Hopkins was present during the execution of the search warrant.  (*Id.*)  After officers recovered several firearms from the residence, two of which had previously been reported stolen, TFO Bates filed a state criminal complaint charging Hopkins with one count of person not to possess a firearm and two counts of receiving stolen property.  (Doc. 67, pp. 2–3; Doc. 68, p. 2.)

Hopkins was arraigned on the state charges filed by TFO Bates on February 19, 2021, before state Magisterial District Justice Hanif Johnson, and he was detained in lieu of $250,000 bail.  (Doc. 67, p. 3.)  The case was assigned to Magisterial District Justice David O'Leary ("MDJ O'Leary").  (*Id.* at 3, n.1.)  Hopkins was unable to post bail.  (*Id.* at 3.)  Hopkins' preliminary hearing on these charges was continued several times.  (*Id.* at 3–4.)

The United States Attorneys' Office ("USAO") received the investigative materials following the execution of the search warrant.  (Doc. 68, p. 3.)  On June 23, 2021, the grand jury returned an indictment charging Hopkins with distribution of a controlled substance, namely cocaine base, in violation of 21 U.S.C. § 841(a)(1), and being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1).  (Doc. 1.)

Based on the indictment, a detainer was sent to Dauphin County Prison, where Hopkins was being detained on the state charges. (Doc. 67, p. 4.) On July 8, 2021, Hopkins had his initial appearance on the federal charges, and he was ordered detained. (*Id.*) The state charges against Hopkins were dismissed on July 28, 2021. (Doc. 68, p. 4.)

## B. Hopkins' Initial Motion to Dismiss

On October 6, 2022, Hopkins filed his initial motion to dismiss the indictment pursuant to the Speedy Trial Act and the Sixth Amendment.[3] (Doc. 66.)[4] Following a hearing on February 2, 2023, the court issued a memorandum and order on March 6, 2023, denying Hopkins' motion to dismiss the indictment. (Docs. 103, 104.)

The initial motion to dismiss challenged Hopkins' detention on both Speedy Trial Act[5] and Sixth Amendment grounds. (Doc. 103, p. 4.) Hopkins asked the court to apply the "ruse exception" and start the Speedy Trial Act clock from his initial arrest on state charges, in February 2021, which was more than thirty days

---

[3] Hopkins also filed a motion to suppress evidence on February 1, 2023, and a supplemental motion to suppress evidence on February 9, 2023. (Docs. 84, 90.) On May 3, 2023, the court denied both motions. (Doc. 122.)

[4] The motion to dismiss also included a request to review Hopkins' detention status pending trial. The court held a hearing on February 16, 2023, to review Hopkins' detention status. Hopkins was released on conditions of release on February 16, 2023, and has remained released from federal custody either on conditions or no supervision to the present day. (Doc. 95.)

[5] In short, the Speedy Trial Act requires that an indictment must be filed within thirty days of the individual's arrest. 18 U.S.C. § 3161(b).

4

prior to the date of the Indictment. (*Id.* at 8.) The "ruse exception," which had not been explicitly adopted by the Third Circuit at the time, allows the Speedy Trial Act clock to be triggered by a state arrest "when the Government has knowledge that an individual is held by the state authorities solely to answer to federal charges." *United States v. Woolfolk*, 399 F.3d 590, 596 (4th Cir. 2005).

Based on the evidence at the first hearing, the court assumed without deciding that the "ruse exception" could apply, but ultimately found that there was insufficient evidence that Hopkins was held on state charges for the sole or primary purpose of preparing a federal prosecution. This conclusion was largely based on the testimony of Dauphin County Assistant District Attorney Erin Varley, who testified that an ADA was present at every preliminary hearing date scheduled for Hopkins, she discussed the preliminary hearing dates with Hopkins' counsel while he was detained on state charges, and the District Attorney's office did not have knowledge that Hopkins was going to be indicted until AUSA Paul Miovas emailed her on June 25, 2021. (Doc. 103, pp. 11, 12.) The court also based this conclusion on TFO Bates' testimony that: "if we did not have enough to charge him federally, that we could go through with the state process." (*Id.* at 12) (quoting Doc. 102, p. 59.)

### C. Motion to Reconsider the Motion to Dismiss

On March 15, 2023, Hopkins filed a motion to reconsider the court's decision on the motion to dismiss based on newly disclosed information. (Doc. 106.) The newly disclosed information was a bail recommendation TFO Bates made to MDJ Johnson before Hopkins was arraigned on the state charges. (*Id.* at 9.) In the bail recommendation, TFO Bates wrote "Affiant requests high bail on defendant due to the nature of the charges and the defendant is being federally indicted. If convicted would be looking at a 15 year mandatory sentence. The defendant does have knowledge of this and does put him at a flight risk." (Doc. 106, p. 9.)

During the first hearing on the motion to dismiss, the bail recommendation was not mentioned. TFO Bates located the bail recommendation on February 23, 2023, twenty days after the first evidentiary hearing in this matter. (*Id.*, ¶ 4.) The document was produced to defense counsel on March 6, 2023–the same day the court filed the original memorandum and order denying Hopkins' motion. (*Id.*, ¶ 8.) On March 16, 2023, following a telephone status conference with counsel, the court granted Hopkins' motion for reconsideration and re-opened the record to consider additional evidence in support of Hopkins' motion to dismiss the indictment. (Doc. 109.)

At the second hearing on the motion to dismiss, inconsistencies developed in TFO Bates' testimony. The main discrepancies between the two hearings involved TFO Bates' discussions with the United States Attorney's Office about whether or not Hopkins would be federally indicted after state charges were filed. TFO Bates' testimony during the first hearing about his conversation with AUSA Johnny Baer was as follows:

> Q: Was Mr. Hopkins actually arrested after the execution of the warrant?
>
> A: Yes.
>
> Q: Who made the decision to file charges?
>
> A: State charges?
>
> Q: Yes.
>
> A: Ultimately I would have been the one to make that decision, but I spoke to AUSA Baer about the case, and he told me to go ahead and do the state charges.
>
> Q: Okay. And did he tell you that — and I don't want you to speculate, but if you had a specific conversation about it, was he telling you that — why did he tell you that based on your perception?
>
> A: Well, this was still an ongoing investigation. A search warrant in itself, you're searching for evidence. There was no talk about having a grand jury set up or indicting him right then and there.
>
> We didn't know what we were walking into from that search warrant. We could have walked into absolutely nothing. Mr. Hopkins may not even have been home. So once we obtained evidence, at that point we knew somewhat of what was going on.

There was still more of an investigation on the firearms, finding out where they're from, finding out if they're functionable, sending them for testing, things like that.

Q: And you, in fact, did go file a complaint? You personally did that?

A: Yes.

Q: Was your superior at the ATF involved in that decision at all?

A: Yes.

Q: What was your understanding, what was your intent when you filed the state criminal complaint against Mr. Hopkins?

A: My intent was if we did not have enough to charge him federally, that we would go through with the state process.

(Doc. 102, pp. 46–48.) Additionally, at the first hearing, TFO Bates was specifically questioned about whether he had any discussions regarding the possibility of a federal indictment. TFO Bates' testimony was as follows:

Q: I [AUSA Paul Miovas] eventually was assigned the case in this matter and contacted you sometime around May or June of 2021. Correct?

A: Yes.

Q: And there was a grand jury that was set up for Mr. Hopkins' case at that point. Correct?

A: Yes.

Q: Prior to that, was there any communication you had with my office from anybody about indicting Mr. Hopkins' case?

A: No.

Q: Did you ever, with Mr. Baer, discuss a charging document, a charging decision at the federal level that would involve charging Mr. Hopkins with a federal crime?

A: No.

Q: Again, my final question is that, is it your experience, based on being a task force officer, that the U.S. Attorney's Office will always indict these cases when you bring them when we have a federal warrant?

A: No, it doesn't always happen.

(*Id.* at 48.)

The prior testimony above is directly contradicted by the written bail recommendation TFO Bates submitted to MDJ Johnson prior to Hopkins' arraignment on February 19, 2021. Therefore, at the second evidentiary hearing, when the record was re-opened on this matter, Hopkins' counsel questioned TFO Bates about the bail recommendation. TFO Bates testified as follows:

Q: So, now, throughout the course of the investigation, you were — you're communicating with Mr. Baer. Correct?

A: Yes.

Q: And I know there was a document that reflected that he and his staff were sending requests for issuance of a search warrant to a federal judge on February 19th of 2021. Correct?

A: Yes.

Q: Or not February 19th, I don't mean to mislead you, February 11th, I believe, of 2021.

A: Yes.

Q: And after it was issued, did Mr. Baer tell you about you now have a warrant?

A: Yes, he would have.

Q: Okay.  And did you talk before the 19th with him, like, hey, what's going on, have you done the warrant yet, have you executed it or what's the game plan?  Did you have those conversations?

A: Once I typically get a warrant, I don't really discuss it with the attorney until I execute it.

Q: Okay.  Now, the day you executed it, you then reported back to Assistant District Attorney Baer — I'm sorry, Assistant United States Attorney Baer?

A: Yes.

Q: And in that conversation, you — let me say this.  The purpose of the search, and you were working with the ATF, was to go in and develop evidence of illegal possession of firearms.  Correct?

A: Yes.

Q: And you went in, and as a result of the research, there were firearms in there that you had believed that were illegally possessed by Mr. Hopkins.  Correct?

A: Yeah.

Q: So you were conducting an investigation into that, the very things that you found?

A: Correct.

Q: And you already knew that you had approval to charge him federally at some point?  I mean, in other words, your superiors, this was an individual worthy of conducting an investigation upon?

A: Yeah, the ATF side, yes.

Q: And so you had a very, very good, firm belief that after finding those firearms, that Mr. Hopkins, as of February 19th of 2021, was going to be indicted federally?

A: I wanted him to, that's my whole purpose of doing that, but I also knew that I can't make that decision.

Q: Well, you don't make that decision. Right? Like, you — that's a decision ultimately that the United States Attorney's Office, with your assistance, they make. Correct?

A: Yes.

Q: And you wouldn't tell a judge that he is being federally indicted on your own without talking to the United States Attorney, would you?

A: No, no, I wouldn't.

Q: So it was only after you had the conversation with the Assistant United States Attorney that you then related to Judge, I think it was Judge Johnson who was setting bail, that he would be federally indicted. Correct?

A: Yes.

Q: So you had a conversation with Mr. Baer, and after that conversation, you felt comfortable relating to the state court judge, set bail high because he is being federally indicted. Correct?

A: Yes.

(Doc. 149, pp. 34–36.) Later during cross-examination, TFO Bates again

unambiguously testified that he only made the bail recommendation after

consultation with AUSA Baer:

Q: And I understand how that works, but ultimately, regardless of who set bail, the purpose of telling him about the pending — he is being federally indicted is because you want bail set high so he couldn't make

it and he would remain incarcerated until you got around to indicting him. Correct?

A: Yes and no. I ultimately — I wanted him indicted, but if it didn't go that route, at least he stayed in the state. I wanted the bail to be high because of not just that, you know, his history, there were other elements involved.

But I mean, that's typically what the officers do for the bail recommendation, is put their recommendation on — and it doesn't always — the judges don't always go by what the officer said, but this situation they did.

Q: I mean, I know you've just told us your reasons for setting it high, but you didn't tell Judge Johnson about his prior criminal history?

A: No, no.

Q: And I think as we said before, you wouldn't have said any of that to the — written that to the judge unless you first spoke with the Assistant United States Attorney you were working with. Correct?

A: No, I spoke more with — like, that information would have came from the agents that I worked with. A.U.S.A. Baer really didn't put too much into it because he didn't really — he wasn't involved with the case much since it just got handed over and he really didn't read into it. He only got what I spoke to him about the chain of — you know, what took place. Like, the 15-year mandatory would have came from agents that had given me their experiences and —

Q: I guess what I was — and I appreciate that answer because there are a couple pieces of information. I was just centering on "is being federally indicted." Forget about —

A: Yes, I see.

Q: You wouldn't have told the judge, hey, he's getting indicted federally, unless you talked to the U.S. Attorney —

A: Correct.

Q: — and that gave you the confidence to be able to relate that information to the judge?

A: Correct.

(*Id.* at 40–42.)

TFO Bates' contemporaneous bail recommendation and testimony during the second hearing starkly contradicted his prior testimony. Consequently, the court questioned TFO Bates about the seemingly irreconcilable testimony. The court pointed TFO Bates to a portion of the transcript from the first hearing, reviewed his prior testimony with him, and the following exchange occurred:

Q: So that was your prior testimony. But on the date when you arrested Mr. Hopkins, you prepared a bail recommendation for the magisterial district justice presiding telling that magisterial district justice that Mr. Hopkins "is being federally indicted."

A: Yes.

Q: Did I read that correctly?

A: Yes.

Q: And in response to Mr. Abom's question a moment ago about whether you would have made such a definitive statement to a judge in writing without authorization from the U.S. Attorney's Office, your answer — I can read it back — was no, I would not have.

A: Yes.

Q: So what did Mr. Baer tell you about returning an indictment, and why is this answer different from the answer you provided before?

A: The answers before, as I took the questions before, were did we actually sit down and talk to somebody saying, yep, we'll indict them on this charge, this charge.

13

When I built this case, I was under the impression that — if this would go the way it would go, I would do these federal charges. Those are the charges I put into the Enforce, our computer system that collects the basic information, the reports. That was my impression.

And then when I talked to A.U.S.A. Baer about the case, I was under the impression with him that he liked it and the fact that Eric Pfisterer, the deputy chief at the time, liked it, as well, my impression was he's ultimately going to be federally indicted.

I left that bail recommendation because I had my discussion with Mr. Hopkins being that the ATF was investigating him on federal charges, that his impression was that he was being indicted, I was in fear that if he was out, he would flee.

That is why I answered the way I did initially. My impression was, the way he was asking me the question, did I actually talk to somebody that said that he was — he is being indicted, no, no. I was under the impression that even if I present the case to Johnny Baer, he could still say there's not enough here, so keep it in the state.

Q: That leaves me confused, because just a moment ago — so in the first hearing you said, no, the word "indictment" basically was not used, it was impressions, it was my understanding, I thought eventually we'd get to an indictment, but we weren't there yet.

But just a moment ago Mr. Abom asked you, before telling a magisterial district judge that someone is being federally indicted, would you need to have authorization from the A.U.S.A. to make such a definitive statement, and you said yes.

A: Okay.

Q: So you leave me confused.

A: I was under the impression meaning, like, to indict somebody, yes. I didn't — not just to say it, that you're going to be indicted.

Q: Well, you didn't use the word "may."

A: No.

Q: You didn't say is possibly being federally indicted.

A: No, I did not.  No, I did not.

Q: It's without qualification when you told the MDJ that Mr. Hopkins is being federally indicted.

A: Yeah, and I put that because I was under the impression.  That could have been wrong to put, but that's my impression when I had the discussion with Eric Pfisterer and A.U.S.A. Baer, that the case is being handled by the U.S. Attorney's Office, an indictment will happen.

(*Id.* at 46–48.)

After this second hearing, with this record, the court granted the motion to dismiss the indictment on Speedy Trial Act grounds.  (Doc. 117.)  Specifically, the court reconsidered its conclusion that there was insufficient evidence showing Hopkins was arrested on state charges solely for the purpose of later filing a federal indictment.  As a result of the inconsistent testimony between the hearings, the court found TFO Bates' testimony from the first hearing not credible and the contemporaneous bail recommendation indicating that Hopkins was going to be indicted more credible.  (*Id.* at 21.)  In considering whether there was collusion between state and federal authorities, the court relied on the bail recommendation and TFO Bates' testimony that he spoke with AUSA Baer who instructed him to file state charges after receiving confirmation in some form that a federal indictment would be returned against Hopkins.  (*Id.* at 22.)  Ultimately, the court concluded that Hopkins had shown that he was held in state custody for the sole

purpose of preparing a federal criminal prosecution and that there had been

collusion between federal and state officials in order to circumvent the Speedy

Trial Act. (*Id.* at 24.)  Therefore, the court dismissed Count 2 of the Indictment.

### D.    The Government's Appeal

On May 3, 2023, the Government appealed the court's order dismissing

Count 2 of the Indictment. (Doc. 123.)  On the same day, the Government also

filed a motion to continue the trial and stay proceedings pending appeal of the

dismissal of Count 2. (Doc. 124.)  The court denied that motion because the

charges in Count 1 were sufficiently distinct from Count 2. (Doc. 129.)  On May

12, 2023, after the parties filed their pre-trial submissions, the Government moved

to dismiss Count 1 of the Indictment. (Doc. 144.)  This motion was granted, the

trial cancelled, and all motions in limine were denied as moot. (Doc. 146.)

On July 9, 2024, the Third Circuit issued a precedential opinion reversing

this court's order dismissing Count 2 of the indictment because the Third Circuit

concluded that the Speedy Trial Act did not contain an implied ruse exception.

(Doc. 153-2.)  The Third Circuit's discussion of the propriety of the ruse exception

is not relevant to the instant motion, however, the Third Circuit included an

observation, which is likely the basis for the instant motion.  The Third Circuit

concluded its opinion with the following:

> We need not reach whether TFO Bates and AUSA Baer colluded to
> evade the limitations of the STA.  We acknowledge, as the *Cepeda-*

*Luna* Court did, that substantial unfairness may potentially result if state and federal authorities collude to detain individuals in the state system for the sole purpose of preparing a federal prosecution. Nothing in this opinion should be read as sanctioning such collusion or delay. In fact, we acknowledge—as did then-Judge Kavanaugh—that an alternative remedy under the Due Process Clause of the Fifth Amendment may be available. *See Knight*, 824 F.3d at 1110. Counsel for the Government agreed at oral argument that such a remedy might be appropriate. And jurisprudence supports such a conclusion. *See Mills*, 964 F.2d at 1192 ("If a defendant showed that the U.S. Attorney deliberately arrested him on D.C. charges and secured a Superior Court indictment in order to gain time to gather additional evidence for a federal prosecution, he might have a valid due process claim for pre-indictment delay"). Though we do not have occasion here to set forth the parameters of such a remedy, we leave further judicial consideration of one to an appropriate, future case.

*United States v. Hopkins*, 106 F.4th 280, 292–93 (3d Cir. 2024), *as modified* (Aug. 2, 2024), *cert. denied sub nom. Hopkins v. United States.*, 145 S. Ct. 1069 (2025).

Thus, Count 2 of the indictment against Hopkins was reinstated, Hopkins was again released on conditions of supervision, and counsel filed the instant motion to dismiss on due process grounds on March 12, 2025. (Docs. 153, 163, 172.) The Government filed a brief in opposition on April 18, 2025. (Doc. 180.) Hopkins filed a reply brief on May 16, 2025. (Doc. 185.) Accordingly, the instant motion to dismiss is ripe and ready for disposition.

## DISCUSSION

Hopkins argues that his due process rights were violated because the state and federal governments colluded to "park" Hopkins in state custody until the federal government further reviewed the case. (Doc. 173, p. 6.) Hopkins argues he

was prejudiced during this time because he was "denied the opportunity to investigate or defend against the federal charges lurking in the background, until the Government decided to proceed with an indictment four months later." (*Id.*) Hopkins heavily relies on the Third Circuit's observation that "substantial unfairness may potentially result if state and federal authorities collude to detain individuals in the state system for the sole purpose of preparing a federal prosecution." (*Id.* at 4, 6) (citing *Hopkins*, 106 F.4th 293).

The Government argues that Hopkins has failed to show any actual prejudice as a result of the months-long delay between the arrest on state charges and filing of a federal indictment. (Doc. 180, p. 6.) The Government contends that the prejudice Hopkins testified to at the first hearing, the inability to recall the events of the date of the controlled buy and inability to find alibi witnesses or phone records, all related to the drug charges in Count 1, rather than the currently pending gun charge in Count 2. (*Id.* at 6, 7.) The Government casts doubt that Hopkins' inability to recall certain events was exacerbated beyond the normal human experience. (*Id.* at 7.) The Government further notes that these allegations of prejudice are "vague and conclusory," and insufficient for establishing a violation of his due process rights. (*Id.* at 7.)

The Government also argues that Hopkins has failed to show that the Government deliberately delayed the prosecution in order to gain a tactical

advantage, because there is little evidence in the record as to why the Government filed state charges or delayed filing an indictment in this case.  (*Id.* at 8.)  The Government notes "it is difficult to discern any tactical advantage for the government from holding Hopkins in state custody until federal indictment rather than letting him remain on the street."  (*Id.* at 8.)  The Government then encourages the court to resort to the statute of limitations and Speedy Trial Act as methods of protecting a defendants' right to a speedy trial.  (*Id.* at 9, 10.)

In reply, Hopkins provides a laundry list of the prejudices he suffered as a result of his detention on state charges.  Namely: 1) he was denied his right to a preliminary hearing; 2) he was not provided a copy of the search warrant; 3) his phone records were no longer available due to his phone company's policies; 4) his family relationships were strained; 5) he was unable to maintain employment and lost property; and 6) he became anxious and depressed and needed to seek mental health treatment as a result.  (Doc. 185, pp. 1, 2.)  Hopkins further argues he was unable to recall details of the date at issue because he was incarcerated and had no access to his personal records.  (*Id.* at 2.)  Hopkins concludes that "substantial unfairness existed in this matter as he was actually prejudiced[,]" and points to the Government's misconduct, as previously discussed by the court in its prior opinion.  (*Id.* at 2.)

The Supreme Court has held that, under Fifth Amendment Due Process Clause considerations, the court must dismiss an indictment "even if it is brought within the statute of limitations, if the defendant can prove that the Government's delay in bringing the indictment was a deliberate device to gain an advantage over him and that it caused him actual prejudice in presenting his defense." *United States v. Gouveia*, 467 U.S. 180, 192 (1984).  However, "the statute of limitations is the 'primary guarantee against bringing overly stale criminal charges[.]'" *United States v. Ladson*, 238 F.App'x 874, 876 (3d Cir 2007) (quoting *United States v. Marion*, 404 U.S. 307, 322 (1971)).

Proof of actual prejudice is "a necessary but not sufficient element of a due process claim, and . . . the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused." *United States v. Lovasco*, 431 U.S. 783, 790 (1977).  "Actual prejudice to the defense of a criminal case may result from the shortest and most necessary delay; and no one suggests that every delay-caused detriment to a defendant's case should abort a criminal prosecution." *United States v. Marion*, 404 U.S. 307 (1971).  Accordingly, the court must undertake "a delicate judgment based on the circumstances of each case[ ]" in order to "accommodate the sound administration of justice to the rights of the defendant to a fair trial[.]" *Id.*  The Third Circuit has further held that "[t]he mere possibility of prejudice inherent in any extended delay, or the mere possibility that

20

a witness might become inaccessible and evidence be lost, is not sufficient."

*United States v. Ismaili*, 828 F.2d 153, 168 (3d Cir. 1987).

On the record before the court, there is not sufficient evidence showing that Hopkins suffered actual prejudice due to being detained on state charges for four months until he was indicted.  As noted by the Supreme Court in *Marion*, relying "solely on the real possibility of prejudice inherent in any extended delay: that memories will dim, witnesses become inaccessible, and evidence be lost[,]" is insufficient to show that Hopkins was actually prejudiced.  Here, Hopkins' assertions of prejudice from lost phone records, faded memory, and lost potential alibi witnesses all fall short because they are only assertions of possible prejudice inherent in the passage of time.  Hopkins has not shown what he could have discovered during this four-month time period and what real effect the discovery of any such evidence would have had on an eventual trial.  *See also United States v. Sebetich*, 776 F.2d 412, 430 (3d Cir. 1985) (in dicta noting that defendant had failed to show actual prejudice where "allegations that witnesses would have provided an alibi that are not targeted quite specifically to the time and location of the alleged offense.")

Having failed to make a showing of actual prejudice, the court could deny the motion on that basis alone.  However, the court will also discuss whether there was intentional delay by prosecutors in order to gain a tactical advantage.

21

There are a few decisions that the court has considered in order to determine whether the Government's conduct in this case deviates from the "fundamental conceptions of justice" and rises to the level of a due process violation in the pre-indictment delay context.  First, the court is mindful that the Supreme Court has expressly held that "the Due Process Clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment[,]" because "investigative delay is fundamentally unlike delay undertaken by the Government solely 'to gain tactical advantage over the accused," precisely because investigative delay is not so one-sided." *Lovasco*, 431 U.S. at 791, 795 (quoting *Marion*, 404 U.S. at 324)).  However, the court then notes that the Third Circuit in dicta in the opinion resolving the appeal in this case acknowledged that collusion between state and federal authorities "to detain individuals in the state system for the sole purpose of preparing a federal prosecution[ ]" may result in substantial unfairness violative of the Fifth Amendment.  *Hopkins*, 106 F.4th at 293; *see also United States v. Mills*, 964 F.2d 1186, 1192 (D.C. Cir. 1992) (holding that "[i]f a defendant showed that the U.S. Attorney deliberately arrested him on D.C. charges and secured a Superior Court indictment in order to gain time to gather additional evidence for a federal prosecution, he might have a valid due process claim for pre-indictment delay[,]"

but, upholding a previous decision finding that there was no evidence that "the U.S. Attorney made transfer decisions to evade the strictures of the Act.")

The Third Circuit has also held that there was no "nefarious purpose" where the AUSA was assigned to the case a week prior to its indictment, had knowledge of the reason for delay, previous AUSAs had not yet indicted due to other responsibilities, and case was reassigned in order to avoid the statue of limitations expiring without indictment. *United States v. Ladson*, 238 F.App'x 874, 876 (3d Cir. 2007). Additionally, the Third Circuit held there was no deliberate delay when the delay resulted from "a mix-up between federal and state authorities[,]" and upon discovering the "mix-up," the government reopened its investigation and returned and indictment within six months. *Sebetich*, 776 F.2d at 430. However, the court does note that neither of the previous two cases from the Third Circuit involved a defendant who was detained on state charges prior to federal indictment.

Although the court has previously strongly discouraged the actions of AUSA Baer and TFO Bates, it is important to understand that discussion was through the lens of the Speedy Trial Act, premised on the erroneous conclusion that the court could apply the "ruse exception" developed in other jurisdictions. Now, through the due process lens currently being applied by the court, there is insufficient evidence in the record to support a conclusion that Government officers acted

intentionally to obtain a tactical advantage over Hopkins. The standard the court must apply now is *not* whether collusion existed–it did–but rather whether the purpose of the Government officers was to delay in order to gain a tactical advantage in the federal prosecution.

On this point, there is simply no evidence of record upon which the court can base a conclusion about the purpose (if any) for the four-month delay between Hopkins' arrest and the return of the federal indictment. Additionally, there is no evidence that the Government gained a tactical advantage by having Hopkins remain in state custody for four months. TFO Bates testified that he followed up on the firearm, retrieved paperwork, such as police reports, regarding Hopkins, and did no further investigation into the drugs because there were no drugs in the apartment. (Doc. 102, p. 65.) None of these investigatory activities would have been impacted had Hopkins been free in the community such that the Government gained a strategic advantage from requesting that Hopkins be detained. As mentioned, there is no explanation of why AUSA Baer did not indict this case more swiftly or why the case was not indicted until it was assigned to AUSA Miovas.

As noted by the Third Circuit, there are strong policy considerations in permitting state and federal authorities to work together, such as avoiding duplication of effort and saving resources. *Hopkins*, 106 F.4th at 292. With no

evidence showing that the Government's coordination was for a nefarious purpose, such as holding Hopkins so that the Government could obtain more evidence or so that the Government could avoid the Speedy Trial Act, the court does not find that the prosecutor's actions offend notions of fairness such that there was a due process violation in this case.  Therefore, the court will deny the motion to dismiss.

CONCLUSION

For the foregoing reasons, the court will deny Hopkins' motion to dismiss the indictment.  An order follows.

<u>s/Jennifer P. Wilson</u>
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: June 16, 2025